## Dianne HOOVER, Respondent,

v.

## NORWEST PRIVATE MORTGAGE BANKING, a division of Norwest Funding, Inc., et al., Petitioners, Appellants.

No. C8–99–1281.

Supreme Court of Minnesota.

Filed as Modified Sept. 6, 2001.

Second Rehearing Denied Sept. 6, 2001.

Barbara Jean D'Aquila, Patrick R. Martin, Flynn & Gaskins, L.L.P., Minneapolis, for plaintiff.

David W. Larson, Moss & Barnett, Minneapolis, for defendant.

Robert R. Reinhart, Erik T. Nelson, Dorsey & Whitney, L.L.P., Minneapolis, for amicus curiae Minnesota Employment Law Council.

## OPINION

PAGE, Justice.

Respondent Dianne Hoover filed suit against appellants Norwest Private Mortgage Banking, a division of Norwest Funding, Inc., Norwest Mortgage, Inc., and Connie McCullough[1] (collectively, Norwest) in Hennepin County District Court asserting claims of negligent supervision and breach of contract as well as claims of discriminatory discharge, failure to make reasonable accommodations, and reprisal in violation of the Minnesota Human Rights Act (MHRA). *See* Minn.Stat. § 363.03, subds. 1(2)(b)-(c), 1(6), 7(1) (2000). The district court granted Norwest's motion for summary judgment on all of Hoover's claims. The court of appeals reversed the district court's decision as to the discriminatory discharge claim, but affirmed the district court's disposition of the other claims. *Hoover*, 605 N.W.2d at 768. We granted Norwest's petition for review of the court of appeals' decision reinstating Hoover's discriminatory discharge claim. We also granted Hoover's cross-petition challenging the dismissal of her reasonable accommodation and repri-

sal claims. Because we conclude from the record that this case presents genuine issues of material fact for trial, we affirm the court of appeals as to the discriminatory discharge claim and reverse as to the reasonable accommodation and reprisal claims, and remand to the district court for further proceedings.

Dianne Hoover was hired by Norwest in November 1992 as a private mortgage banker, an at-will position. Private mortgage bankers are commonly referred to as loan originators. Norwest terminated Hoover's employment in February 1996. Throughout her employment at Norwest, with the exception of the performance review conducted the day of her termination, Hoover consistently performed at or above expectations and had no disciplinary problems. In a March 1995 review of loan files for compliance with various internal policies, Hoover tied for the highest rating achieved by the loan originators in her office, while two other loan originators had substantial compliance problems. In 1994, she received the award for best underwriting rating among the loan originators. Her performance was such that in January 1996 Norwest increased her personal lending authority—up to $500,000—and she was awarded a mid-February trip to Florida.

According to Hoover, her troubles at work began in May 1995 when she was diagnosed with fibromyalgia, a condition that caused her to suffer severe headaches, sleeplessness, fatigue, pain in her neck, shoulders, back, and hips, and depression-like symptoms. Her physician prescribed exercise, stress-reduction techniques, and an anti-depressant medication. Hoover

---

1. Hoover's lawsuit also named Norwest Corporation as a defendant. Norwest Corporation was dismissed as a defendant, *Hoover v. Norwest Private Mortgage Banking, a Div. of* *Norwest Funding, Inc.*, 605 N.W.2d 757, 768 (Minn.App.2000), and no appeal was taken as to that decision. As a result, Norwest Corporation is no longer a party to this litigation.

stated in her deposition that, from May 1995 until her termination, the symptoms of her fibromyalgia made it difficult for her to remember and to concentrate. She also stated that, while she was able to do her job between May 1995 and her termination, it took her longer and was more difficult because of her memory loss and inability to concentrate. Hoover's coworkers corroborate her statement that she spent extra hours at the office in her attempt to keep up with her work, stating in affidavits that Hoover "worked long hours to complete her work," and "it took [Hoover] extra hours to complete her work." Hoover's medical records do not show that she discussed workplace accommodation measures with her doctors.

A few days after her May 1995 diagnosis, Hoover informed her supervisor, Connie McCullough, that she had been diagnosed with fibromyalgia. Hoover claims in both her deposition and her affidavit that she talked with McCullough at least seven more times about her fibromyalgia, telling McCullough that because of her condition she needed special help to do her job. One of Hoover's coworkers stated in an affidavit that she discussed Hoover's fibromyalgia with McCullough and that McCullough knew that the fibromyalgia was limiting Hoover's ability to work. Hoover also states in both her deposition and affidavit that she told her team leader, Cal Eich, that because of her physical condition she could not handle the volume of loans she had without more loan processing support.[2] McCullough acknowledges that Hoover informed her about being diagnosed with fibromyalgia in 1995 and that Hoover made repeated requests for processing support, but claims that Hoover never connected her requests for processor support to her fibromyalgia. Moreover, McCullough asserts that, both before and after Hoover's diagnosis, lack of loan processing support was a problem and source of frustration for all of the loan originators at Norwest Private Mortgage.

In December 1995, McCullough had all of Hoover's files audited for compliance with Norwest policy and federal regulations. The auditor stated that she had never before been asked to perform an audit of this type. According to McCullough, the special audit was prompted by concerns raised by two loan processors and the branch operations supervisor about Hoover's compliance with Norwest's policies and with federal law. The auditor submitted the results of the special audit to McCullough on January 24, 1996, reporting that Hoover's files in many respects did not comply with Norwest policies and perhaps violated federal law.[3] The auditor recommended additional training and oversight for Hoover.

A February 7, 1996, memo from Hoover to McCullough, written in anticipation of

---

**2.** It is unclear on the record before us whether and to what extent Eich, as Hoover's team leader, had managerial authority over her or was required to relay information to other management personnel. In her deposition, Hoover was asked whether she understood that Eich was not a managerial person who had any authority over her; Hoover replied that this was not her understanding.

**3.** The auditor found "significant evidence that the dates and types of applications taken [were] altered by [Hoover] in order to have the file appear to be in compliance." The evidence included applications dated by Hoover instead of the customer, applications that indicated they had been received by mail yet contained customer signatures on the same day as Hoover signed, loans for which interest rates had been locked in prior to the loan application date, and applications for which credit reports were pulled prior to the loan application date. While the auditor found possible federal law violations, it is not clear from the record that there were actual violations of federal law.

an upcoming performance review, sets out Hoover's belief that she was "set up to fail" and that without support she could not do her job. That same day, according to Hoover, she told McCullough that she needed loan processing support help, that she could no longer work under the current conditions, that her health was suffering, and that she was going to contact the personnel department to get help. Two days later, McCullough and McCullough's supervisor, Craig McWilliams, met with Hoover to discuss, among other things, what Norwest considered to be possible violations of law found in the special audit of Hoover's files. At that meeting, Hoover mentioned her fibromyalgia and, in answer to McWilliams' query as to what that was, McCullough told him it was "like MS." McWilliams asked Hoover if her fibromyalgia prevented her from doing her job and Hoover answered no. Hoover's employment was terminated later that day. Norwest maintains that Hoover was terminated for legitimate business reasons including "legal compliance concerns."

■ In her deposition, Hoover admitted that, with a few exceptions, the audit report's factual observations with respect to her loan files were accurate. In her post-deposition affidavit, Hoover clarified her deposition answer, stating that had she been afforded an opportunity to review her files before her dismissal she could have demonstrated to her supervisors that her files were not out of compliance and that

her actions were not unlawful or contrary to Norwest policy.[4] The auditor admitted in her deposition testimony that she occasionally made mistakes in her audits.

After her termination, Hoover availed herself of Norwest's internal problem-solving process to review her termination. In a February 20, 1996, letter to McWilliams, Hoover specifically tied her past requests for loan processing support to her medical condition, noted that the lack of processing support was overwhelming and made it impossible for her to do her job properly, claimed that her termination was in retaliation for her February 7 letter to McCullough and her continued requests for support, and asked for "reasonable accommodation" for her "disability." McWilliams replied with a letter stating that he had investigated the issues Hoover raised and had determined that Hoover's termination was not discriminatory as it was based on Hoover's legal and regulatory noncompliance. McWilliams also stated that Hoover had the same access to support staff as her peers. Hoover's appeal of McWilliams' decision under the Norwest internal problem-solving process was rejected.

Affidavits from the branch operations supervisor and Hoover's coworkers indicate that Hoover was the only person at Norwest Private Mortgage Banking disciplined for having files out of compliance. Six weeks after Hoover's dismissal, an au-

---

**4.** Norwest argues that Hoover's post-deposition affidavit is self-serving and completely contradictory to her deposition statements and, therefore, incompetent evidence. Although affidavits that contradict earlier deposition testimony generally may not be used to create a genuine issue of fact, there are exceptions to this rule. *See Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1365 (8th Cir.1983) (adopting the general rule, but recognizing an exception for cases in which an affidavit explains and clarifies the deposi-

tion statements, rather than simply contradicting them); *see also Banbury v. Omnitrition Int'l, Inc.*, 533 N.W.2d 876, 881 (Minn. App.1995) (noting that a post-deposition affidavit may raise a factual issue when the deposition reveals confusion or mistake and when the affidavit seeks to explain the deposition testimony). We have considered only those portions of Hoover's affidavit that clarify evidence already present elsewhere in the record.

dit was performed on the files of all loan originators from Hoover's section at Norwest Private Mortgage Banking. The audit indicated that the files of several loan originators had errors similar to those attributed to Hoover's files at the time of her termination. This audit did not result in any loan originators being dismissed or otherwise disciplined for having files that were out of compliance.

In January 1997, Hoover filed a charge against Norwest with the Minnesota Department of Human Rights (MDHR) alleging disability discrimination, failure to provide reasonable accommodation, and retaliatory discharge. The MDHR found probable cause to believe that Norwest engaged in an unfair discriminatory practice and this lawsuit ensued.

■ On appeal from summary judgment, we must determine whether there are genuine issues of material fact for trial and whether the lower courts erred in their application of the law. *Cummings v. Koehnen*, 568 N.W.2d 418, 420 (Minn. 1997). We consider the evidence in the light most favorable to the nonmoving party. *Id.*

### I. Discriminatory Discharge Claim

■ Under the MHRA, it is an unfair employment practice for an employer to discharge or otherwise discriminate against an employee because of the employee's disability. Minn.Stat. § 363.03, subd. 1(2)(b)-(c). Discrimination plaintiffs may prove discriminatory intent by direct evidence or by using circumstantial evidence in accordance with the three-part burden-shifting test set out by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Feges v. Perkins Restaurants, Inc.*, 483 N.W.2d 701, 710-11 (Minn.1992); *see also Anderson v. Hunter, Keith, Marshall &*

*Co.*, 417 N.W.2d 619, 623 (Minn.1988) ("As the result of the substantial similarities existing between Title VII and [the MHRA], we have frequently applied principles which have evolved in the adjudication of claims under the federal act, and, specifically we have adopted the *McDonnell Douglas* analysis as an aid to resolving cases claiming disparate treatment.").

■ Under that test, the plaintiff alleging a discriminatory employment practice must first make out a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. As applied to the discriminatory discharge setting, the plaintiff must show that she: "(1) is a member of [a] protected class; (2) was qualified for the position from which she was discharged; and (3) was replaced by a non-member of the protected class." *Feges*, 483 N.W.2d at 711. If the plaintiff makes out a prima facie case, the burden of production shifts to the defendant who, in order to avoid summary judgment, must produce admissible evidence sufficient to allow a reasonable trier of fact to conclude that there was a legitimate, nondiscriminatory reason for the discharge. *Id.* If the defendant provides a legitimate, nondiscriminatory reason for its actions, the presumption of discrimination disappears and the plaintiff has the burden of establishing that the employer's proffered reason is a pretext for discrimination. *See Hasnudeen v. Onan Corp.*, 552 N.W.2d 555, 557 (Minn.1996); *Anderson*, 417 N.W.2d at 623-24.

Norwest contends that Hoover has failed to establish that she is disabled within the meaning of the MHRA (and therefore not a member of a protected class), arguing that Hoover's symptoms from the fibromyalgia between May 1995 and February 1996 were not severe enough to make her disabled under the law. Norwest cites several federal court cases for

the proposition that fibromyalgia, with symptoms comparable to Hoover's, does not qualify as a disability. Norwest cautions us that to consider Hoover disabled under the law leads to an absurd result that "broadens 'disability' to include anyone with any medical condition, who merely claims some unspecified and essentially unverifiable amount of pain and fatigue and resultant increased time to do the job."

■■■■ A disabled person is one who: "(1) has a physical, sensory, or mental impairment which materially limits one or more major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment."[5] Minn. Stat. § 363.01, subd. 13 (2000); *Sigurdson,* 532 N.W.2d at 228. The degree to which a condition limits one or more major life activities is evaluated based on the plaintiff's specific circumstances. *See State by Cooper v. Hennepin County,* 441 N.W.2d 106, 111 (Minn.1989). When, as here, the plaintiff alleges that work is the major life activity in which she is materially impaired, we consider "(a) the number and type of jobs from which the impaired individual is disqualified, (b) the geographic area to which the applicant has reasonable access, (c) the applicant's own job expectations and training, (d) the criteria or qualifications in use generally, and (e) the types of jobs to which the rejection would apply."[6] *Id.*

■■■■ Hoover argues that she was disabled at the time of her termination, stating that her fibromyalgia caused her to suffer headaches, muscle and joint pain, sleeplessness, and depression. According to Hoover, these symptoms caused her to have difficulty concentrating, learning, and retaining information. As a result, it not only took her longer to do her job than it did before the onset of her fibromyalgia, but it limited her ability to perform her job.

■■■■ Hoover points out that some time after being told that Hoover had been diagnosed with fibromyalgia, McCullough gave Hoover a brochure that described a medical program for those with fibromyalgia. According to evidence submitted by Hoover, McCullough also discussed with a coworker the limiting effect fibromyalgia was having on Hoover's ability to work.

Viewed in the light most favorable to Hoover, as it must be at this stage of the litigation, the competent evidence[7] in the

5. The federal Americans with Disabilities Act requires a "substantial limitation" rather than "material limitation." 42 U.S.C. § 12102(2). In *Sigurdson v. Carl Bolander & Sons, Co.,* 532 N.W.2d 225, 228 & n. 3 (Minn.1995), we recognized that the 1989 amendment to the MHRA definition of "disability," changing "substantial limitation" to "material limitation," Act of May 25, 1989, ch. 280, § 1, 1989 Minn. Laws 1099, 1100, made the state law definition different from and less stringent than the federal definition of a disability. In each of the federal cases cited by Norwest for the proposition that fibromyalgia is not a disability, the court applied a definition that required at least a "substantial limitation." *See, e.g., Skorup v. Modern Door Corp.,* 153 F.3d 512 (7th Cir.1998); *Kocsis v. Multi–Care Mgmt., Inc.,* 97 F.3d 876 (6th Cir.1996); *Hainke v. Gleeson, Sklar, Sawyers & Cumpata, LLP,* 71 F.Supp.2d 885 (N.D.Ill.1999); *Aquinas v. Fed. Express Corp.,* 940 F.Supp. 73 (S.D.N.Y.1996).

6. When we adopted these factors in *State by Cooper,* the MHRA definition of "disability" required that the condition "substantially" rather than "materially" limit a major life activity. *See supra* note 5. As we noted in *Sigurdson,* "[t]he factors and considerations are now viewed in a less stringent light, nevertheless, they remain the same." 532 N.W.2d at 228.

7. In addition to arguing that Hoover's post-deposition affidavit is self-serving and therefore incompetent evidence, *see supra* note 4, Norwest argues that Hoover relies on incom-

record establishes that she suffered from severe headaches, sleeplessness, fatigue, chronic pain, and a depression-like state, and that these symptoms caused her to experience difficulty concentrating and remembering, which caused her to expend extra time and effort in an ultimately failed attempt to keep up with her work. Applying the five factors set forth in *State by Cooper*, we note that Hoover had experience in the loan origination field and no experience in any nonbanking field. Any job similar to that of a loan originator, utilizing skills and experience consistent with her background, would seemingly require Hoover to meet deadlines. However, her impairment limited her ability to handle heavy workloads and deadlines. Thus, Hoover has raised a fact question as to whether she is impaired in the major life activity of work.

Norwest argues that the symptoms Hoover alleges lack the specificity and severity necessary for a disability. While in another case a combination of severe headaches, sleeplessness, and fatigue may not constitute a disability under the MHRA, in this case Hoover has substantiated her allegations with concrete evidence suggesting that the fibromyalgia materially limited her ability to work. We conclude that Hoover has established a genuine issue of fact as to whether she was disabled.

■■■ Norwest also argues that the alleged errors found in Hoover's files during the special audit establish that she was not qualified for the loan originator position. For the purposes of establishing that she was qualified for the position from which she was dismissed, a plaintiff need only establish that she met the minimum objective qualifications for the job. *Legrand v. Trustees of Univ. of Ark. at Pine Bluff*, 821 F.2d 478, 481 (8th Cir.1987); *State by Khalifa v. Hennepin County*, 420 N.W.2d 634, 640 (Minn.App.1988) (applying *Legrand* to MHRA disability discrimination claim), *rev. denied* (Minn. May 4, 1988); *see also Miller v. Centennial State Bank*, 472 N.W.2d 349, 352 (Minn.App. 1991) (applying *Khalifa* to claim of discriminatory termination on the basis of disability). The competent evidence in the record establishes that Hoover had a long career in the banking industry and, before her diagnosis with fibromyalgia, had been a highly rated loan originator for Norwest.

petent evidence in the form of unsworn letters from purported experts in attempting to establish that her fibromyalgia constituted a disability and that reasonable accommodation by Norwest would have allowed Hoover to perform her job despite her disability. The court of appeals reasoned that the question of the admissibility of the unsworn letters was not before the panel because Norwest had not moved to strike the letters in the district court. *Hoover*, 605 N.W.2d at 763. Norwest argues that it made clear in its memoranda to and arguments before the district court that the letters were not competent evidence. In reaching our conclusion in this case, we did not consider the unsworn letters.

The appendix to Hoover's brief to this court contains 27 pages of deposition testimony and documents that were not in the trial court's summary judgment record. (App. to Resp't's Br. at 253–54, 257–61, 263, 288–290, 294–301, 303–310.) Norwest has filed a motion to strike this material and all references to it in Hoover's brief. Norwest also requests award of costs and fees for this motion. Under Minn. R. Civ.App. P. 110.01, the record on appeal comprises: "The papers filed in the trial court, the exhibits, and the transcript of the proceedings * * *." The appendix to respondent's appellate brief may contain only portions of the record. *See* Minn. R. Civ.App. P. 130.01–02; *Merle's Constr. Co., Inc. v. Berg*, 442 N.W.2d 300, 303 (Minn.1989) (striking, on this court's own motion, an affidavit added to record after the court of appeals' decision because "counsel has no right on appeal to change the record"). The rules preclude Hoover's additions to the record. We grant Norwest's motion to strike the material added by Hoover and references to that material. In no part of this decision did we rely on that material. No costs or fees are awarded.

The extent to which she continued to meet the requirements of her job in the winter of 1995–96 and the extent to which her files were not in compliance with internal Norwest standards and federal law at the time of her termination are disputed questions of fact. Hoover has at least created a genuine issue of fact as to whether she met the minimum objective qualifications of her job.

Finally, it is not disputed that Hoover was replaced by a nondisabled person. Thus, the record leads us to conclude that Hoover has met her burden of establishing, sufficient to survive summary judgment, the requirements of a prima facie case for discrimination: that she is a disabled person, was qualified for the position from which she was discharged, and was replaced by a nondisabled person.

■ Having made out a prima facie case, the burden shifts to Norwest to articulate a legitimate, nondiscriminatory reason for Hoover's discharge. Norwest contends that Hoover was terminated because her files failed to comply with internal policy and federal regulations. Because this reason, on its face, is legitimate and nondiscriminatory, we conclude that Norwest has rebutted Hoover's prima facie case. This brings us to the third step of the *McDonnell Douglas* analysis. Under this third step, Hoover must establish that

Norwest's proffered reason is a pretext for discrimination. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507–08, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Hasnudeen,* 552 N.W.2d at 556–57.

■ What must Hoover show at the summary judgment stage to establish that Norwest's proffered reason is pretext for discrimination? The United States Supreme Court recently declared that "[p]roof that the defendant's explanation is unworthy of credence * * * may be quite persuasive. In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is * * * cover[ing] up a discriminatory purpose." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (citation omitted).[8,9] This is consistent with the Court's statement in *Hicks:*

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination, and the Court of Appeals was correct when it noted

**8.** Regarding the question of how a plaintiff shows that the employer's articulated, nondiscriminatory reason is pretext for discrimination, the Court stated that, although the presumption of discrimination drops out of the case once the employer articulates a nondiscriminatory reason for its employment decision, "the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom ... on the issue of whether the defendant's explanation is pretextual.'" *Reeves,* 530 U.S. at 143, 120 S.Ct. 2097 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine,* 450

U.S. 248, 255 n. 10, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

**9.** In *Reeves,* the Court was considering a case concerning an employer's motion for judgment as a matter of law in an age discrimination suit, but the standards for granting summary judgment and for granting judgment as a matter of law are the same, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), so the standard articulated in *Reeves* may be transferred to the summary judgment context. *E.g., Rhodes v. Guiberson Oil Tools,* 75 F.3d 989, 993 n. 4 (5th Cir.1996).

that, upon such rejection, "[n]o additional proof of discrimination is *required.*" *Hicks,* 509 U.S. at 511, 113 S.Ct. 2742 (alteration in original) (footnote omitted).

The *Reeves* Court clarified, however, that:

> This is not to say that such a showing by the plaintiff will *always* be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred. See *Aka v. Washington Hospital Center,* 156 F.3d [1284,] 1291–92 [ (D.C.Cir.1998) (en banc) ]; see also *Fisher v. Vassar College,* 114 F.3d [1332,] 1338 [ (2d Cir.1997) (en banc) ] ("[I]f the circumstances show that the defendant gave the false explanation to conceal something other than discrimination, the inference of discrimination will be weak or nonexistent").

*Reeves,* 530 U.S. at 148, 120 S.Ct. 2097.

Thus, as we read *Reeves,* in order to avoid summary judgment under the *McDonnell Douglas* third step, the employment discrimination plaintiff must put forth sufficient evidence for the trier of fact to infer that the employer's proffered legitimate nondiscriminatory reason is not only pretext but that it is pretext for discrimination. In some cases, sufficient evidence may consist of only the plaintiff's prima facie case plus evidence that the employer's proffered reason for its action is untrue. In other cases, more may be required. However, at all times the employment discrimination plaintiff retains the burden of establishing that the defendant's conduct was based on unlawful discrimination.

The Court's analysis in *Reeves* is not only persuasive, it is also consistent with our earlier cases in this area. *See, e.g., Hasnudeen,* 552 N.W.2d at 557 (noting that our cases are in line with the *Hicks* requirement that the plaintiff ultimately persuade the fact finder by a preponderance of evidence that the defendant discriminated against the plaintiff). A rule that would preclude summary judgment for defendants in all cases in which the employment discrimination plaintiff was able to show that the employer's articulated reasons were pretextual, without a requirement that the reasons be pretext for discrimination, would prevent summary judgment even in cases when "no rational factfinder could conclude that the action was discriminatory." *Reeves,* 530 U.S. at 148, 120 S.Ct. 2097. Such a rule would put employment discrimination plaintiffs at a distinct advantage, one that no other plaintiffs enjoy.

Applying the standard from *Reeves* to the competent evidence before us in this case, we conclude that a rational trier of fact could infer that Norwest engaged in intentional discrimination. The record establishes that Hoover had been a strong employee at Norwest for three years, steadily receiving good evaluations and increased responsibilities. In a review of a sampling of files from all loan originators at her branch of Norwest Private Mortgage two months before her fibromyalgia diagnosis, Hoover tied for the highest compliance rating, but approximately eight months later, after hearing complaints that Hoover's loan files were

out of compliance, McCullough requested that an auditor perform an unprecedented review of all of Hoover's loan files. The audit found Hoover's files to be out of compliance with Norwest standards and possibly with federal law. This period of noncompliance followed Hoover's diagnosis and coincided with the difficulties she had keeping up with her work—difficulties due, she claims, to the symptoms caused by her medical condition. The auditor recommended that Hoover be warned, trained, and monitored, but instead Hoover was fired. Hoover was the only loan originator fired for having files that were out of compliance despite the fact that, both before and after her diagnosis and termination, routine audits of samples of files from other loan originators showed that some of them had similar numbers and types of noncompliant files. This collection of evidence casts sufficient doubt on the truthfulness of Norwest's proffered reason for dismissing Hoover, her alleged "legal and regulatory compliance violations," to allow a rational finder of fact to conclude that the reason offered was pretext for a discriminatory discharge. Hoover has met her burden of creating a genuine issue of material fact as to whether she was discharged in violation of Minn.Stat. § 363.03, subd. 1(2)(b)-(c). Therefore, we affirm the decision of the court of appeals with respect to Hoover's disability discrimination claim.

## II. Reasonable Accommodation

We next consider Hoover's reasonable accommodation claim. Under Minn.Stat. § 363.03, subd. 1(6), employers with the requisite number of employees are required to "make reasonable accommodation to the known disability of a qualified disabled person * * *." A qualified disabled person is a disabled person "who, with reasonable accommodation, can perform the essential functions" of the job in question. Minn.Stat. § 363.01, subd. 35(1) (2000).[10] Thus, in order to maintain a reasonable accommodation claim, Hoover is required to establish that Norwest knew of her disability and failed to make a reasonable accommodation for that disability. The district court concluded that Hoover's fibromyalgia is not a disability under Minn.Stat. § 363.01 and thus no reasonable accommodation was required. Although the court of appeals concluded that Hoover had created genuine issues of material fact sufficient to avoid summary judgment as to whether she was disabled due to her fibromyalgia and whether Norwest was aware of her fibromyalgia, it nonetheless affirmed the district court because it concluded that Hoover failed to establish that she requested an accommodation for her fibromyalgia.

Norwest explains its failure to accommodate Hoover's disability by arguing that Hoover never requested a reasonable accommodation in that she never tied her requests for loan processing support to her fibromyalgia. Norwest claims that, because the lack of loan processing support was a frequent complaint among all loan originators, it could not distinguish Hoover's requests from those of other loan originators without her tying those requests for support to her fibromyalgia.

**10.** If an employer defendant contends that the plaintiff is not a qualified disabled person, the employer bears the burden of showing it was reasonable to conclude that the disabled employee could not have met the requirements of the job, even with reasonable accommodation. Minn.Stat. § 363.01, subd. 35 (2000).

The employer may also defeat a reasonable accommodation claim by showing that the accommodation would impose an undue hardship on the operation of the employer's business. Minn.Stat. § 363.03, subd. 1(6). Norwest has not alleged these facts as a basis for summary judgment in its favor.

The competent evidence in the record is sufficient to establish genuine issues of material fact as to whether Norwest knew of Hoover's disability. We reach that conclusion based on the following evidence. In her deposition, Hoover asserted that she informed McCullough and Eich about her fibromyalgia and its effect on her ability to work. She also asserted that she told McCullough at least eight times that she needed assistance because of her health. Hoover admits that she did not tell McCullough that she was being discriminated against on the basis of a disability, but states that she "tried to make it very clear to [McCullough] that I had fibromyalgia, I needed special help, and how it affected me * * *." One of Hoover's coworkers stated that she discussed Hoover's fibromyalgia with McCullough and that McCullough knew that it was limiting Hoover's ability to work. Hoover also claims that in one of her conversations with Eich he agreed that she needed help because of her health, but said he did not know what to do. She claims that in a meeting two days before she was terminated she told McCullough that she needed support help because of her health and was going to the personnel department to obtain it. Because we conclude that there are genuine issues of material fact as to whether Norwest knew of Hoover's need for processing support as a result of her fibromyalgia, summary judgment in Norwest's favor on Hoover's reasonable accommodation claim was improper. Accordingly, we reverse the court of appeals' resolution of Hoover's reasonable accommodation claim.

### III. Reprisal

 Finally, we consider whether Hoover's reprisal claim can withstand Norwest's motion for summary judgment. It is an unfair discriminatory practice to engage in reprisal against any person because that person opposed a practice prohibited by the MHRA. Minn.Stat. § 363.03, subd. 7(1). A reprisal claim is analyzed under the *McDonnell Douglas* burden-shifting test. *Fletcher v. St. Paul Pioneer Press,* 589 N.W.2d 96, 101 (Minn. 1999). The prima facie case for reprisal consists of: "(1) statutorily-protected conduct by the employee; (2) adverse employment action by the employer; and (3) a causal connection between the two." *Hubbard v. United Press Int'l, Inc.,* 330 N.W.2d 428, 444 (Minn.1983).

 Hoover claims that by requesting the reasonable accommodation of more loan processing support she engaged in statutorily protected activity and that, because of this activity, she was fired. She contends that she was terminated because she told McCullough, on February 7, 1996, that she was going to the human resources department to talk about her need for accommodation and about the lack of support she was receiving. Two days after this conversation with McCullough, Hoover called Norwest's personnel department and left a message. Later that morning, her employment was terminated. Standing alone, a request for assistance in performing one's job may not constitute protected activity, but when the employee specifically ties a request for work assistance to a disability, the employee engages in protected activity under the MHRA. Moreover, beyond her statements to McCullough on February 7, Hoover supports her contention that she sought help by asserting that she went to Eich with her individualized complaints regarding her need for processor support and its relation to her health and asked him if she should go to personnel for help. Hoover also alleges that she told McCullough on at least eight occasions that she needed processor support because of her fibromyalgia.

Viewed in the light most favorable to Hoover, the record establishes that Hoover engaged in protected activity under the MHRA when she sought accommodation specifically for her fibromyalgia, satisfying the first element of her prima facie case. There is no dispute her termination constituted adverse employment action, the second element. Finally, given the events leading up to Hoover's termination, the timing of her termination, and the fact that no other similarly situated employee suffered the same fate, a reasonable fact finder could infer that there was a causal connection between the first two elements, satisfying the third element. We therefore conclude that Hoover has made out a prima facie case for reprisal.

The second and third steps of the *McDonnell Douglas* analysis for Hoover's reprisal claim involve facts and analysis almost identical to those we have already addressed in considering Hoover's disability discrimination claim, and the same result obtains. Norwest has produced sufficient evidence to allow a reasonable trier of fact to conclude that there was a legitimate reason for the discharge, not based on reprisal. *See Feges*, 483 N.W.2d at 711. However, through evidence of her previously favorable performance reviews and the coincidence of her request for assistance based on her medical condition with the adverse employment action, Hoover has established a material issue of fact regarding whether Norwest's proffered reason is a pretext for reprisal. As with the disability discrimination claim, there are genuine issues of material fact that a fact finder could resolve in favor of Hoover, allowing her to prove that her termination was in reprisal for seeking a reasonable accommodation. Therefore, we reverse the court of appeals on this issue.

Affirmed in part, reversed in part, and remanded to the district court for further proceedings.