*This opinion is nonprecedential except as provided by Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A23-0991**

Karen Painter, PhD.,
Appellant,

vs.

Board of Regents of the University of Minnesota,
Respondent.

**Filed April 1, 2024
Affirmed**

**Cochran, Judge**

Hennepin County District Court
File No. 27-CV-21-8723

Karen Painter, Mendota Heights, Minnesota (pro se appellant)

Douglas R. Peterson, University of Minnesota General Counsel, Lisa L. Beane, Senior Associate General Counsel, Minneapolis, Minnesota (for respondent)

Considered and decided by Johnson, Presiding Judge; Cochran, Judge; and Klaphake, Judge.*

**NONPRECEDENTIAL OPINION**

**COCHRAN**, Judge

Appellant challenges the summary-judgment dismissal of her sex-discrimination and reprisal claims under the Minnesota Human Rights Act (MHRA), Minn. Stat.

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

§§ 363A.01-.50 (2022 & Supp. 2023).[1] Appellant's MHRA claims against respondent arise from respondent's decision to deny a promotion to appellant. Because no genuine issues of material fact exist regarding whether respondent's proffered nondiscriminatory reason for declining to promote appellant was a pretext for discrimination or reprisal, we affirm. We also grant respondent's motion to strike, and we deny appellant's motions.

## FACTS[2]

Appellant Karen Painter began working for the University of Minnesota's School of Music (SoM) as a non-tenured associate professor in 2007. The SoM is part of the College of Liberal Arts. Painter was a professor in the SoM's musicology and ethnomusicology division, which was one of eight divisions within the SoM. In 2011, the university promoted Painter to a tenured associate-professor position. In 2018, Painter sought promotion to full professor. The university denied the promotion. Before turning to the specific facts surrounding the denial of the promotion, we provide some general background on the promotion policies and procedures at the university.

---

[1] The MHRA was amended in 2023. 2023 Minn. Laws ch. 52, art. 19, §§ 45-72, at 325-38. Previous versions of the MHRA were in effect both during the underlying events and when the district court granted respondent's motion for summary judgment. The amendments do not change the substance of the sections applicable to Painter's claims. We therefore cite the current version of the MHRA. *See Interstate Power Co. v. Nobles Cnty. Bd. of Comm'rs*, 617 N.W.2d 566, 575 (Minn. 2000) (recognizing "general rule . . . that appellate courts apply the law as it exists at the time they rule on a case").

[2] Consistent with the standard of review, our recitation of the facts is based on the evidence viewed in the light most favorable to the nonmoving party. *See Kenneh v. Homeward Bound, Inc.*, 944 N.W.2d 222, 228 (Minn. 2020). "[W]e do not weigh facts or make credibility determinations." *Id.*

*The University's Standards for Tenure and Promotion*

At relevant times, tenure and promotion at the university, and within the SoM, were governed by a "Faculty Tenure" policy adopted by respondent Board of Regents of the University of Minnesota. Under the policy, the basis for awarding a promotion to full professor was determined by an assessment "of the candidate's record of scholarly research or other creative work, teaching, and service." The university maintained procedures to "assist in implementation" of the Faculty Tenure policy. The procedures provided that the university's academic units must, in compliance with section 7.12 of the Faculty Tenure policy, "have a document specifying the indices and criteria that will be used to evaluate candidates, and those criteria will apply to all candidates for tenure and/or promotion in the unit." This document was known as the "7.12 Statement."

The SoM's 7.12 Statement detailed how a candidate's research, teaching, and service were evaluated. Because the SoM consisted of eight divisions with varying disciplines, "the term 'research' encompasse[d] a wide variety of professional activities." Thus, the 7.12 Statement included division-specific criteria for evaluating a candidate's research. The criteria for musicology candidates provided that, "candidates [were] expected to have attained professional recognition on the basis of high-quality scholarly publications and activities associated with their field." Such publications were "most commonly" either "a book, monograph, or edition, representing original research or analysis" or "articles in professional journals, book chapters, and essays in scholarly volumes." Additionally, the 7.12 Statement indicated that a "written work is considered to be published when it satisfies two standards:  it is under contract, and in production."

3

Regarding teaching, the 7.12 Statement provided that candidates "must be effective teachers." A candidate's effectiveness as a teacher was evaluated by consideration of twelve benchmarks, including the candidate's courses taught, contributions made to the curriculum of the department, evaluation by peers, development and review of instructional material, and student-feedback ratings. As for service, the 7.12 Statement required candidates to "actively participate in advancing the interests of the department, the college, and university for the benefit of the institution, the profession, and the community."

Separate from the SoM's requirements, the College of Liberal Arts had guidelines for promotion and tenure, which included instructions for how promotion and tenure dossiers should be prepared by candidates. Under those guidelines, "in cases of promotion to the rank of professor, scholarly research and/or creative work, teaching and service shall be considered from the time since last promotion."

*Painter Applies for Promotion*

Painter's application for full professorship underwent a multi-level review process, consistent with the university's Faculty Tenure policy. The process began after Painter indicated that she was interested in promotion to full professor. Painter was assigned another professor, or "caseworker," to help her prepare her application dossier. Once completed, the research portion of Painter's dossier was submitted to six external reviewers, whose feedback became part of Painter's application file.

From there, the first layer of Painter's review process began when Painter's caseworker presented her case file at a faculty meeting consisting of full professors from the SoM. The minutes from the October 2, 2018 faculty meeting reflect that the professors

4

had concerns about Painter's teaching and research. The professors discussed issues with Painter's organization of classes, noting that "students were frustrated by the lack of clear direction," and that Painter's student reviews corroborated concerns raised by a peer reviewer. The minutes state that Painter's research component "hinge[d] entirely on [her] planned book," which was "neither reviewed nor under contract." The professors noted a "conspicuous absence of articles in the field" and questioned why Painter did not wait to apply for promotion "until there's a contract for her book." The SoM's professors voted against promoting Painter in an anonymous poll by a vote of 14 to 1, with 4 professors abstaining.

At the second layer of review, the SoM's director issued his "professional opinion" on Painter's application. The director agreed with the faculty vote, concluding that Painter's dossier did not meet the requirements for promotion. The director noted that, despite some favorable comments from external reviewers about Painter's scholarly research, the research component had to be scrutinized under the 7.12 Statement's musicology-specific criteria. The director observed that Painter had just "one refereed article that would qualify for inclusion" under the 7.12 Statement, and that Painter's "book manuscript [was] not yet officially under contract or publication." The director cited one external review that noted Painter's manuscript was "unusual" in that it had "not yet been peer-reviewed, [was] not under preliminary contract, nor [had] it reached its final form." The reviewer added that the manuscript "badly needs editing." Because Painter did not have a robust body of peer-reviewed articles and did not have a book under contract or

5

ready for publication, the director concluded that Painter did not meet the "research threshold for promotion as outlined in the [SoM's] 7.12 statement for musicology."

And, regarding Painter's teaching component, the director stated that "Painter's teaching has drawn mixed responses." The director also noted that her student-evaluation data were "below university norms in a number of areas." The director concluded that Painter's teaching did not meet the criteria for promotion either. On October 15, 2018, the director submitted a letter to the dean of the College of Liberal Arts expressing his opinion that Painter failed to meet the criteria for promotion.

The College of Liberal Arts' promotion-and-tenure committee performed the third layer of review. The committee consisted of professors from various departments across the college. In November 2018, the committee met and created a report on Painter's bid for promotion. The committee discussed Painter's student and peer evaluations, which were ambivalent about Painter's teaching. Of note, Painter's student-evaluation scores were "uniformly low" in the category of whether students would recommend her as an instructor. Yet, Painter's dossier included "uniformly strong teaching letters from [her] colleagues." A majority of the committee believed that Painter at least met the teaching requirement "with reservations."

As for Painter's research, the committee members focused on the 7.12 Statement and observed that Painter's book manuscript "cannot be considered for promotion." The committee members found Painter's remaining publication record "vague and inconsistent" and "noted only one peer reviewed article." Following their discussion, the

6

committee members voted unanimously that Painter did not meet the overall requirements for promotion.

At the fourth layer of review, the dean of the College of Liberal Arts received the promotion-and-tenure committee's report and evaluated Painter's promotion file. The dean determined that Painter met the criteria for service but failed to satisfy the criteria for teaching and research. The dean wrote that he "await[ed] the book being in print or in final contract to publish status" and that there was "a broad and consistent pattern of student comments expressing concerns about her teaching." The dean therefore recommended that Painter "retain the current rank of associate professor with tenure."

The fifth and final level of review concluded on May 2, 2019, when the provost informed Painter in a letter that she had "not yet met the [SoM's] 7.12 criteria for promotion to full professor." The provost emphasized "the near consensus" within the SoM and the College of Liberal Arts that Painter did not meet the research requirement. The provost noted that she did "not necessarily agree that [Painter] ha[d] not met School or College expectations for teaching," but still encouraged Painter to address the teaching concerns raised throughout the review process. The provost concluded, based on Painter's dossier, that Painter would not receive a promotion to full professor at that time.

*Painter's Discrimination Reports*

Painter made several reports of discrimination throughout her promotion process. Painter's first report was to the university's Office of Equal Opportunity and Affirmative Action (EOAA) a few weeks before the first layer of review by the SoM faculty. The EOAA determined that Painter's concerns "were not ripe for investigation given that the

7

promotion process was ongoing." After the promotion process concluded, Painter again contacted the EOAA, which thereafter initiated its investigation into Painter's claims that "certain male faculty members in the SoM have engaged in multiple acts of sex discrimination and retaliation."

Among the individuals implicated by Painter's reports were Professors A, B, and C, who were among the SoM professors eligible to vote on her promotion. Painter alleged that Professor A had made sexually inappropriate comments about her, including commenting on her skirt length and describing her behavior as "seductive" in an email. The EOAA determined that Professor A's conduct was "unwelcome conduct of a sexual nature" but did "not rise to the level of sexual harassment or another form of gender-based discrimination." Painter also claimed that Professor A retaliated against her for participating in an unrelated EOAA investigation into Professor A's conduct in 2013. The alleged retaliation included a ten-page letter that Professor A submitted to Painter's promotion file in October 2018, in which Professor A criticized Painter for her involvement with the 2013 investigation. The EOAA determined that Professor A's letter likely constituted retaliation, but also that there was insufficient evidence that Professor A or his letter negatively influenced other SoM professors during Painter's promotion bid.

Painter also claimed that Professor B retaliated against her after she reported that Professor B had been asking students a sexually inappropriate question during oral doctoral exams. The EOAA determined that a student also reported concerns over the question directly to Professor B. Once Professor B learned of concerns over the sexual nature of the question, Professor B acknowledged that the question was inappropriate, shared the

8

student's report with his supervisors, and stopped asking the question on future exams. Painter alleged that, in response to her involvement, Professor B retaliated against her by making inappropriate comments about her during the SoM faculty discussion about her promotion bid. The EOAA concluded that there was insufficient evidence that Professor B had discriminated or retaliated against Painter.

Finally, the EOAA investigated Painter's claims that Professor C had also retaliated against her for encouraging a student to report Professor C for sexual harassment in 2011. The EOAA determined there was insufficient evidence that Professor C retaliated against Painter during her promotion bid because it was unclear that Professor C even knew about Painter's involvement with the student's report at the time of Painter's promotion bid.[3]

Painter also filed complaints with the university's Senate Judicial Committee (SJC) and the Minnesota Department of Human Rights (MDHR). Like the EOAA, the SJC and MDHR found insufficient evidence to tie Painter's promotion denial to any discriminatory or retaliatory animus.

*The Lawsuit*

In July 2021, Painter sued the Board of Regents, alleging that the university discriminated against her based on sex, age, marital and familial status in violation of the MHRA and that the university retaliated against her in violation of the MHRA. Painter also brought three other claims. The university filed a motion to dismiss. The district court granted the motion with respect to all of Painter's claims except for sex discrimination and

---

[3] In a declaration, Professor C stated that he did not know of Painter's involvement in the student's report until 2022, well after her failed promotion bid.

reprisal under the MHRA. Painter filed an amended complaint alleging only the two remaining MHRA claims.

The university thereafter moved for summary judgment. The district court granted the university's motion. In its decision, the district court reasoned that Painter had shown a prima facie case of sex discrimination and retaliation under the MHRA but also that the university had articulated a legitimate, nondiscriminatory reason for refusing to promote Painter to full professor—namely, that Painter failed to meet the SoM's criteria for promotion. And the district court determined that Painter failed to show that the university's proffered reason was pretextual. Accordingly, the district court concluded that the university was entitled to summary judgment on Painter's MHRA claims.

Painter appeals.

## DECISION

Painter challenges the district court's decision to grant summary judgment to the university on her MHRA claims, raising several arguments. In addition, both Painter and the university seek relief based on motions filed during this appeal. We first address Painter's summary-judgment arguments and then turn to the pending motions.

## I. The district court did not err by granting summary judgment on Painter's MHRA claims.

We review a grant of summary judgment de novo to determine "whether there are any genuine issues of material fact and whether the district court properly applied the law." *Henry v. Indep. Sch. Dist. No. 625*, 988 N.W.2d 868, 880 (Minn. 2023). "In determining whether there are genuine issues of material fact, we view the evidence in the light most

favorable to the nonmoving party and resolve all doubts and factual inferences against the moving parties." *Hanson v. Dep't of Nat. Res.*, 972 N.W.2d 362, 372 (Minn. 2022) (quotation omitted). "Fact issues exist when reasonable persons might draw different conclusions from the evidence presented." *Id.* "We will affirm a grant of summary judgment if no genuine issues of material fact exist and if the [district] court accurately applied the law." *Id.* at 371-72.

The MHRA makes it unlawful for an employer, because of sex, to "discriminate against a person with respect to hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment." Minn. Stat. § 363A.08, subd. 2(3). The MHRA also prohibits an employer from "intentionally engag[ing] in reprisal against any person" because that person "opposed a practice forbidden under [the MHRA]." Minn. Stat. § 363A.15. "A reprisal includes, but is not limited to, any form of intimidation, retaliation, or harassment." *Id.*

When a party moves for summary judgment on an MHRA employment-discrimination claim and the claim does not involve direct evidence, courts employ the burden-shifting framework set out by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to allocate the burdens between the plaintiff and the defendant. *See Hanson*, 972 N.W.2d at 372-73; *Hoover v. Norwest Priv. Mortg. Banking*, 632 N.W.2d 534, 548 (Minn. 2001). The *McDonnell Douglas* analysis has three steps: first, the employee has the burden of showing a prima facie case of discrimination. *Hanson*, 972 N.W.2d at 373. Second, the burden shifts to the employer, who must articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.*

11

Third, the burden shifts back to the employee, who must establish that the employer's proffered legitimate, nondiscriminatory reasons are pretext for discrimination. *Id.* The same three steps apply to a summary-judgment analysis of an MHRA reprisal claim. *Hoover*, 632 N.W.2d at 548.

Painter challenges the district court's determination that she failed to allege sufficient facts to survive summary judgment on the third step—whether the university's proffered reason for refusing to promote Painter was pretextual. Assuming without deciding that the parties met their respective burdens at steps one and two, we conclude that the district court correctly determined that Painter failed to establish a genuine issue of material fact regarding pretext.

To survive summary judgment on the pretext prong, the employee must establish a disputed issue of material fact about "whether the employer gave an honest explanation of its behavior." *Benassi v. Back & Neck Pain Clinic, Inc.*, 629 N.W.2d 475, 482 (Minn. App. 2001), *rev. denied* (Minn. Sept. 11, 2001). The employee can establish pretext by showing that the proffered reason is "untrue" or that the adverse employment action was motivated by an "improper reason." *Hanson*, 972 N.W.2d at 373.

Painter argues that the university's nondiscriminatory reason for refusing to grant her promotion to full professor—i.e., that Painter did not meet the criteria in the 7.12 Statement for research and teaching—is untrue. Painter contends that a variety of evidence casts doubt on the honesty of the university's explanation for why she was denied promotion. That evidence relates to the conduct of Professors A, B, and C, statistics regarding female and Black professors who work for the SoM, procedural "irregularities"

during the promotion process, and the university's "inconsistent" explanations for denying Painter's promotion. She argues that this evidence, individually and collectively, creates a genuine issue of material fact regarding whether the university's proffered reason is mere pretext for a discriminatory or retaliatory motive.

Before examining Painter's purported evidence of pretext, we note that Painter's brief on appeal does not adequately cite the record. And, where she does include citation, Painter cites her first complaint, which was later amended. "To forestall summary judgment, the nonmoving party must do more than rely on unverified or conclusionary allegations in the pleadings or postulate evidence which might be produced at trial." *W.J.L. v. Bugge*, 573 N.W.2d 677, 680 (Minn. 1998) (quotation omitted); *see also DLH, Inc. v. Russ*, 566 N.W.2d 60, 71 (Minn. 1997) ("[T]he party resisting summary judgment must do more than rest on mere averments."). Although Painter has largely failed to meet her burden to produce any evidence beyond mere speculation, we nonetheless address her arguments regarding pretext and conclude that they fail based on the evidence in the record before us.

### A. Retaliation

First, Painter argues that evidence of conduct by Professors A, B, and C creates a genuine dispute of material fact that the university's reasons for refusing to promote her were pretext for a retaliatory motive. We are not persuaded.

#### 1. Professor A

The EOAA determined that Professor A retaliated against Painter for her involvement in a 2013 investigation into another staff member's complaint of

Professor A's discriminatory conduct. The EOAA found that Professor A retaliated by (1) sending "highly critical emails to Painter" in 2017 "in order to criticize Painter's involvement in the 2013 investigation"; (2) sending an email to Painter, the SoM director, the College of Liberal Arts dean, and another administrator on October 29, 2018, in which Professor A again criticized Painter for her involvement in the 2013 investigation; and (3) "submitting a 10-page letter to Painter's promotion file, where it would be read by the decision-makers on Painter's promotion case," again to criticize Painter for her role in the 2013 investigation.

Painter argues that the EOAA's findings, along with the fact that Professor A once served as the director of the SoM and "continued to serve in the SOM as a highly paid full professor," create a genuine issue of material fact regarding whether Professor A's retaliatory conduct impacted her promotion case. This argument is not supported by the record.

First, Professor A testified at his deposition that he did not discuss Painter's promotion bid with anyone at the SoM before casting his electronic vote. And the SoM minutes of the faculty meeting where Painter's bid was discussed show that Professor A was not present. Second, Professor A did not submit the ten-page letter to Painter's promotion file until after the SoM faculty voted 14 to 1 against Painter's promotion and the SoM director indicated his opposition to promoting Painter. Thus, the undisputed evidence reveals that Painter's bid for promotion was already faring poorly before Professor A submitted his criticisms of Painter to her promotion file. And the dean testified that Professor A's letter played no role in his decision to recommend against promoting

14

Painter. Relatedly, the EOAA found no evidence that Professor A's "letter affected the decision on Painter's promotion." The record overwhelmingly rejects Painter's position that Professor A influenced the promotion procedure beyond casting a single vote.

### 2. Professor B

Painter asserts that she produced evidence that Professor B "was angry at Painter for having complained about his conduct in May 2018" and retaliated against her during the SoM faculty discussion on her promotion bid. But Painter's only support for this claim is her own speculation and references to her complaint. Nothing in the record suggests that Professor B retaliated against Painter. The record does not even reflect whether Professor B voted on Painter's bid, and, even if he did vote, his single vote is immaterial considering the SoM faculty voted against Painter's promotion by a 14 to 1 vote.

### 3. Professor C

Likewise, Painter's arguments regarding Professor C are no more than speculation. Painter claims that a reasonable inference is that Professor C retaliated against her for encouraging a student to report Professor C for sexual harassment in 2011 by voting against her bid for promotion. But the undisputed declaration of Professor C is that he did not even know Painter was involved in that report until four years after the SoM faculty's vote. Thus, no reasonable juror could conclude that Professor C retaliated against Painter in 2018, thereby making the university's proffered reason pretextual.

As a result, the evidence pertaining to Painter's male colleagues, although troubling, is insufficient to permit a reasonable inference that the university's reasons for denying Painter's promotion were pretextual.

B.      *Statistical Evidence*

Nor are we persuaded that statistics relied upon by Painter regarding SoM professors create a genuine issue of material fact as to pretext. Courts have considered whether the use of statistical evidence can create a genuine issue of material fact precluding summary judgment on an employment-discrimination claim. One federal appellate court noted that, "[w]hile statistical evidence may create an inference of discrimination, the evidence may be so flawed as to render it insufficient to raise a jury question." *Furr v. Seagate Tech., Inc.*, 82 F.3d 980, 986 (10th Cir. 1996).[4] In *Furr,* the Tenth Circuit concluded that the plaintiff's statistics did not create a jury question because the statistics "grouped all employees together regardless of specialty or skill and failed to take into account nondiscriminatory explanations for the disparate treatment by showing disparate treatment between *comparable* individuals." *Id.* at 987 (quotation omitted). Similarly, when considering an employment-discrimination claim under the MHRA, this court held that "[i]t is incumbent on the party basing an argument on statistical data to demonstrate that the proffered conclusions are statistically significant." *Albertson v. FMC Corp.*, 437 N.W.2d 113, 116-17 (Minn. App. 1989). "[T]he mere recitation of statistics, without some evidence tending to show that they indicate a meaningful phenomenon, does not show that the statistics are probative of [pretext]." *Id.* at 117.

---

[4] When construing MHRA employment-discrimination claims like Painter's, Minnesota courts often rely on federal employment-discrimination cases for their persuasive value. *Henry*, 988 N.W.2d at 880.

16

Citing only her complaint, Painter asserts the following "statistical evidence":  (1) "very few women were hired or promoted as full professors in the academic area [of the SoM] before 1990"; (2) since 1990, "only one woman was promoted to full professor in the academic area and she was promoted in 2022 after Painter filed this lawsuit"; (3) "over the last thirty years, at least 15-17 men have been promoted to full professor or hired laterally at full professor in the academic area"; (4) at the time of the complaint's filing, all eight full professors in the academic area were men, and "of the eight associate professors in the academic area, two are men who are decades younger than the six associate professors who are women"; and (5) the SoM has not promoted or laterally hired any Black full professors, further demonstrating the SoM's preference for white men.

Painter fails to establish how these statistics show a "meaningful phenomenon" within the SoM.  *See id.*  Painter merely asserts that the SoM has failed to hire women in the academic area without offering any statistical evidence of the number, sex, and qualifications of prior candidates.  Thus, Painter's statistics provide no means to determine whether the SoM has consistently failed to hire and promote women who were comparable to their male counterparts.  *See Furr*, 82 F.3d at 987.  We therefore conclude that the statistical evidence Painter relies on is "so flawed as to render it insufficient to raise a jury question." *See id.* at 986.

C.      *Procedural Irregularities*

Without citing the record, Painter asserts that at least 11 alleged procedural irregularities impacted her promotion process.  Painter attributes the various irregularities to the EOAA, the College of Liberal Arts dean, the SoM, and its director.  Painter faults

17

the district court for addressing "some of these procedural irregularities and not others." But the district court had no reason to address such irregularities because Painter's argument below was not focused on specific procedural irregularities. Rather, she argued that the actions of her male colleagues within the SoM support an inference that the entire promotion process was tainted by the first layer of review. Issues raised for the first time on appeal are not properly before this court. *Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1988). Therefore, we conclude that Painter has forfeited an argument based on procedural irregularity.

In any event, her argument is not supported by evidence in the record. First, it is unclear why the alleged procedural irregularities in the EOAA's investigation of Painter's complaints of discrimination would suggest that her promotion process, itself, was biased. Additionally, Painter offers no evidence of the standard procedures that the SoM, the university, or their employees deviated from in assessing Painter's bid for promotion. Painter's argument fails to amount to more than speculation, which is insufficient to survive summary judgment. *See Russ*, 566 N.W.2d at 71.

D.      *Inconsistent Explanations*

Finally, Painter refers to "inconsistent explanations" from the university regarding the reason for denying her promotion to suggest that there is a disputed issue of material fact regarding pretext. Painter assets that while some levels of review deemed her teaching insufficient, the promotion-and-tenure committee was "split" on whether she met the teaching criteria, and the provost did "not necessarily agree" that Painter failed to meet the expectations for teaching.

18

This argument is unpersuasive for two reasons. First, the record reflects that, at each level of review, there was some hesitation about Painter's teaching component because evaluators had to grapple with Painter's mix of both positive and negative feedback. Evaluators noted that Painter received praise from students and colleagues for her expertise in her subject area but was also routinely criticized for organizational shortcomings. Evaluators also emphasized Painter's student-feedback data, which fell below departmental norms. Because Painter's teaching received mixed feedback, there was naturally some nuance among the levels of review on the role of Painter's teaching component in the denial of her application for promotion. But this does not mean that the explanations were inconsistent. Moreover, that there were disagreements among the various levels about Painter's teaching suggests that the layers were insulated from each other and less susceptible to being affected by retaliatory colleagues at the first layer of review, as Painter suggests.[5]

Second, there was a "near consensus" at each level of review that Painter had not met the research criteria for a promotion. The university's polices reflect that research is a critical component in a candidate's promotion bid. The SoM faculty noted Painter's "conspicuous absence of articles in the field" and questioned why Painter applied for

---

[5] Painter argues that the district court erred by stating that the Board of Regents performed a sixth level of review because the Board of Regents only plays a role in the approval, not the denial, of promotions. The university concedes that the Board of Regents did not "affirm" the decision to deny Painter's promotion. Despite the district court's erroneous characterization of the role of the Board of Regents, our review is de novo, and we conclude that the analysis remains the same whether there were five or six layers of review. The district court's error was harmless, and we will therefore ignore it. *See* Minn. R. Civ. P. 61.

promotion in 2018 instead of waiting until her book was under contract. Likewise, the SoM president wrote, "With one refereed publication . . . since tenure, a more robust body of peer reviewed or refereed articles/essays, or published book (or book contract) is lacking." The promotion-and-tenure committee voted ten to one that Painter failed to meet the research criteria for promotion, noting that Painter's "articles were not enough for promotion" and her book "still had 'rough edges' and needed more work for publication before promotion should be considered." Both the College of Liberal Arts dean and the university provost concurred with these conclusions. Given the overwhelming opposition to Painter's promotion based on the critical research component, we conclude that Painter's argument that the university had inconsistent explanations is unavailing.

We are not persuaded otherwise by Painter's reliance on *Veikos v. Trustees of Univ. of Penn.*, Case No. 2:20-cv-04408-JDW, 2022 WL 190311 (E.D. Penn. Jan. 11, 2022), an unpublished federal decision in which a professor's employment-discrimination claim survived summary judgment. Although Minnesota courts applying the MHRA in the employment-discrimination context often look to federal Title VII caselaw for "guidance," *see Friend v. Gopher Co.*, 771 N.W.2d 33, 38 (Minn. App. 2009), we are not bound by federal decisions, *Hinckley Square Assocs. v. Cervene*, 871 N.W.2d 426, 430 (Minn. App. 2015). *Veikos* is also readily distinguishable on its facts and would not compel us to reverse even if it were binding. *See Veikos*, 2022 WL 190311, at *3-5.

In sum, Painter has not presented evidence sufficient to create a genuine issue of material fact on whether the university's refusal to promote her was based on a discriminatory or retaliatory motive rather than her research and teaching record. Thus,

20

the district court properly granted summary judgment to the university on Painter's MHRA claims.[6]

## II. Motions

The parties filed several motions with this court following the filing of Painter's reply brief. The university moves to strike Painter's reply addendum, which consists of the six external reviews conducted during Painter's promotion process. The university argues that the documents in the reply addendum are not part of the record because they were not submitted to the district court. The university also seeks to strike the portions of Painter's reply brief that reference the addendum.

The record on appeal consists of "[t]he documents filed in the trial court, the exhibits, and the transcript of proceedings." Minn. R. Civ. App. P. 110.01. We cannot base our decision on any matters outside the record. *Thiele*, 425 N.W.2d at 582-83. We "will strike documents included in a party's brief that are not part of the appellate record." *Est. of King*, 992 N.W.2d 410, 415 (Minn. App. 2023) (quotation omitted). The external reviews were summarized in other documents in the record, but the reviews themselves were not filed with the district court and are not part of the record on appeal. We therefore grant the university's motion to strike Painter's reply addendum and pages four through

---

[6] Painter also claims the district court erred by dismissing her suit without addressing "the other claims in the complaint." Painter appears to argue that she sufficiently pleaded claims for (1) "pay discrimination" and (2) emotional damages arising from a hostile work environment independent of her 2018 promotion denial. Painter's argument relies on several portions of her original complaint that were omitted from her amended complaint after the district court granted the university's motion to dismiss several of Painter's claims. Painter also did not argue these theories below, and they are therefore forfeited on appeal. *See Thiele*, 425 N.W.2d at 582.

six of her reply brief. We further note that our decision does not rely on any of the stricken materials.

In response to the university's motion, Painter filed her own motion to strike, along with motions to remand and for sanctions. Painter moves to strike one sentence from the respondent's brief, which states, "The professors who reviewed Painter's record—and agreed that promotion was not warranted—included experts in her field from outside the University . . . ." Painter argues that the university misstates the opinions of those experts in her field that submitted external reviews to her application file. The university responds that this sentence "is based on record evidence"—specifically, the SoM summary documents that referenced the external reviews. Based on our review of the record, we agree with the university. While Painter may disagree with the university's interpretation of that record evidence, it was not improper for the university to make an argument based on evidence in the record.

Painter also moves to strike the university's addendum because it includes "internal letters prepared by [SoM] faculty and administrators" that reflect "only part of Painter's promotion file . . . and occasionally reference the external reviewers' letters without acknowledging the external reviewers' strong support for Painter's promotion." This argument is unpersuasive because all of the documents included in the university's addendum were filed in the district court and are part of the record on appeal. For these reasons, we deny Painter's motion to strike.

Next, Painter argues that this case should be remanded back to the district court because "the University submitted only parts of Painter's promotion file to the district

22

court" but the district court "was led to believe that *all* relevant portions of Painter's promotion file were part of the record." Painter cites no caselaw in support of her contention that the university was required to submit "all relevant portions" of her promotion file when it moved for summary judgment. Nor does she explain how the court "was led to believe" that all relevant portions of her promotion file were part of the record submitted by the university. And Painter fails to acknowledge that when she responded to the university's motion for summary judgment, she could have submitted the external reviews and any other documents from her promotion file that the university did not submit. We therefore discern no basis to grant Painter's motion for remand.

Finally, Painter moves this court to sanction the university's counsel pursuant to Minnesota Rule of Professional Conduct 3.3, which concerns "Candor Toward the Tribunal." Painter asserts that the university's counsel "made intentional or extremely reckless misrepresentations to this Court and to the district court about Painter's external review letters." Painter claims that omitting the reviews from the record amounts to an "egregious deceit upon the district court." We disagree. The record does not suggest that the university's counsel violated rule 3.3. And, again, if Painter wanted to challenge the university's characterization of the external reviews, she had the opportunity to file the external reviews with the district court. We therefore deny Painter's motion for sanctions.

For these reasons, the university's motion to strike is granted and Painter's motions to strike, for remand, and for sanctions are denied.

**Affirmed.**

23