**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,
Plaintiff,**

v.

**AUTOMATIC SYSTEMS CO., Defendant.**

No. 99–723 (DSD/JGL).

United States District Court,
D. Minnesota.

Jan. 18, 2001.

---

Reuben Daniels, EEOC, Milwaukee, WI 53203–2292 and Laurie A. Vasichek, Esq., Tina Burnside, Esq., EEOC, Minneapolis, MN, counsel for plaintiff.

David Y. Trevor, John M. Eastwood, Esq., Holly S. Eng, Esq. and Dorsey & Whitney, Minneapolis, MN, counsel for defendant.

## ORDER

DOTY, District Judge.

This matter is before the court on defendant's motion for summary judgment. Based on a review of the file, record, and proceedings herein, the court grants defendant's motion in part and denies defendant's motion in part.

## BACKGROUND

Defendant Automatic Systems Co. ("ASC") is an Iowa corporation which manufactures and sells electronic panels. It employs approximately 30 people, half of whom work in its St. Paul, Minnesota facility and the other half of whom work at its Ames, Iowa location. Gary Kraus is president of the company and oversees the day-to-day business operations, including hiring and firing. Greg Kraus, Gary's brother, manages the Iowa facility.

Alan Nordman ("Nordman") was employed by ASC from February 1992 until his resignation in May 1996. Nordman had previously worked for 28 years in a similar electronic panel assembly facility and had been a supervisor for at least 10 years before losing his job to downsizing. Gary Kraus knew Nordman and offered him a position in ASC's Iowa facility as a "'hands-on' working supervisor." [Burnside Aff., Exh. 2]. Kraus believed Nordman had the skills not only to assemble panels but also to reorganize and supervise ASC's panel fabrication and assembly shop. Although Kraus' job offer letter indicated that Nordman would also supervise personnel, Nordman had no actual hiring, firing or disciplinary authority and his responsibilities vis-a-vis his coworker were limited to coordinating work flow through the shop. However, according to Kraus' letter, Nordman's advancement opportunities would "essentially be unlimited based on performance, increased panel shop ac-

tivity, [Nordman's] dedication, and company profitability." [*Id.*]

Kraus was aware at the time he hired Nordman that Nordman had suffered a severe heart attack in 1985. During the initial job interview, Kraus and Nordman discussed Nordman's health history, which Kraus dismissed as having no effect on Nordman's ability to do the job. Kraus and Nordman also discussed Nordman's plan to move his family to Iowa. Nordman later abandoned that plan in favor of commuting weekly between Ames and his home in Minnesota.

During his tenure at ASC, Nordman estimates that approximately 80 percent of his work time was devoted to assembling panels and 20 percent of his time dedicated to supervisory tasks. Although ASC did not conduct formal performance reviews, Nordman annually received letters from Gary Kraus praising his work and rewarding him with raises and bonuses. However, Nordman's coworkers in the Iowa facility had voiced concerns to Greg Kraus about Nordman's ability to handle the stress of high work volume and tight deadlines. Specifically, they told Kraus that Nordman would yell and swear at people "if anything deviated from his way of doing things" and was once seen "red in the face" and "walking around in a daze." [Greg Kraus dep. pp. 23–26; Gary Kraus dep. pp. 46–49]. Greg Kraus had a direct encounter with Nordman in which Nordman "blew up" during a discussion about a defective panel and threatened to quit his job. [Greg Kraus dep. pp. 33–34].

In November 1995, Nordman was hospitalized for a mild heart attack. Nordman did not call in to work or have anyone notify ASC of the reason for his absence. After Gary Kraus called Nordman's wife and learned that Nordman had been hospitalized, ASC arranged for Nordman's shop coworker, John Server, to assume Nordman's supervisory responsibilities during his absence. Nordman was away from work for approximately two weeks, during which time he received full compensation.

In late April 1996, Nordman underwent angioplasty and was out of work for one week. Nordman believes he advised Greg Kraus prior to the surgery that he would be out for several days. However, Greg Kraus testified that he was only aware that Nordman was going to see his cardiologist on Friday, not that an angioplasty had been scheduled for the following week. When Gary Kraus phoned Nordman's home on Tuesday, he learned Nordman was going to be out of work for the entire week. Gary Kraus and Greg Kraus decided that due to Nordman's health problems and the fact that production was behind schedule, Server should permanently assume the scheduling and shop coordination duties. The decision was made without consulting Nordman or his treating physician.

When Nordman returned to work on May 7, 1996, Greg Kraus called Nordman to his office and explained that Nordman would focus on building panels and Server would assume supervisory responsibilities. Gary Kraus testified that this was "absolutely not" a demotion and Nordman suffered no loss of pay or benefits. [Gary Kraus dep. p. 65]. However, Nordman testified that he had originally accepted the position with ASC because of the supervisory component, and he now feared loss of advancement opportunities within a growing company and loss of respect from coworkers. Nordman protested to Greg Kraus and made two phone calls over the course of the next day to Gary Kraus, but both individuals were firm in their decision.

Nordman did not return to work at ASC. He was hired by another company on June 18, 1996, to work as an assembler and is currently employed as a working

lead in another panel shop. The Equal Employment Opportunity Commission ("EEOC") has filed a lawsuit on Nordman's behalf under the Americans with Disabilities Act, alleging that ASC unlawfully demoted Nordman from his supervisory position and constructively discharged him because Nordman had a record of a disability and was regarded as disabled. ASC moves for summary judgment of dismissal of both claims.

## DISCUSSION

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). The moving party bears the burden of demonstrating to the court that no genuine issue of material fact exists. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is material only when its resolution affects the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *See id.* at 250, 106 S.Ct. 2505.

On a motion for summary judgment, the court views the evidence in a light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences without assessing credibility. *See Miller v. National Cas. Co.*, 61 F.3d 627, 628 (8th Cir.1995). In addition, the Eighth Circuit has counseled that "sum-mary judgment should seldom be used in employment-discrimination cases." *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir.1994). However, the nonmoving party may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. *See Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. Moreover, if a party cannot support each essential element of its claim, summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. *See id.* at 322–23, 106 S.Ct. 2548. With this standard at hand, the court considers ASC's motion for summary judgment.

## I. ADA Discrimination Claim

### A. Analytical Framework

■ The ADA prohibits employment discrimination by an employer "against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a). A plaintiff may establish that his employer violated his rights under the Americans with Disabilities Act under two alternative theories. *See Stacks v. Southwestern Bell Yellow Pages, Inc.*, 996 F.2d 200, 201 (8th Cir. 1993). If he relies on circumstantial evidence, the familiar burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), applies.[1] However, if the plaintiff can demonstrate that an illegitimate criterion (i.e., erroneous perception of disability) was a motivating factor in the em-

---

1. Under this framework, the plaintiff must show that: (1) he is a disabled person within the meaning of the Act; (2) he is qualified to perform the essential functions of the job he seeks either with or without reasonable accommodation; and (3) he has suffered adverse employment action under circumstances giving rise to an inference of unlawful discrimination. *See Benson v. Northwest Air-*

*lines, Inc.*, 62 F.3d 1108, 1112 (8th Cir.1995). If the plaintiff sets forth a prima facie case of discrimination, the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for the employment action. *See id.* If the employer successfully makes this showing, the burden shifts back to the plaintiff to present evidence that the employer's proffered reason is pretextual. *See id.*

ployment decision, *McDonnell Douglas* is inapplicable and the defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if the illegitimate criterion was not relied upon in the decision making process. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 258, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); *Stacks,* 996 F.2d at 202; *see also Wicks v. Riley Cty. Bd. of Cty. Comm'rs.,* 2000 WL 1772471 at *5 (D.Kan. Nov.30, 2000) (discussing applicability of the *Price Waterhouse* analysis to an ADA claim); *Braziel v. Loram Maintenance of Way, Inc.,* 943 F.Supp. 1083, 1093 (D.Minn.1996) (same).

### B. Disability

Regardless of the operating analytical framework, the court must first determine whether plaintiff is disabled within the meaning of the ADA. *See* 42 U.S.C. § 12111(8); *see also Weber v. Strippit, Inc.,* 186 F.3d 907, 912 (8th Cir.1999) ("The threshold issue is whether plaintiff had a 'disability.' ").

The ADA defines disability as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [the] individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). The EEOC claims that Nordman had a record of a substantially limiting impairment. It also argues that ASC mistakenly regarded Nordman as disabled due to his heart condition.

### C. Record of Impairment

■ The ADA's definition of "disability" may be satisfied if the plaintiff has "a record" of an impairment that substantially limits one or more major life activities. *See* 42 U.S.C. § 12102(2)(B). "The intent of this provision, in part, is to ensure that people are not discriminated against because of a history of disability." 29 C.F.R.

pt. 1630, app. § 1630.2(k). To satisfy this section, a plaintiff must demonstrate that "a record relied on by an employer indicates that the individual has or has had a substantially limiting impairment." *Id.* In other words, the record must show an impairment that satisfies the ADA. *See id.*

■ The EEOC has provided no record showing that Nordman suffers from an impairment that has substantially limited any of his major life activities. Instead, it argues that Nordman's well-known history of heart problems, including heart attacks in 1985 and 1995, bypass surgery in 1987 and angioplasty in 1996 serves as a record of disability. However, the law is clear that mere hospitalization is insufficient to establish a record of disability. *See Gutridge v. Clure,* 153 F.3d 898, 901 (8th Cir.1998). Therefore, absent some evidence that Nordman has suffered from a substantially limiting impairment, the EEOC's discrimination claim cannot proceed on this basis.

### D. "Regarded As" Disabled

■ In the alternative, the EEOC contends that Nordman is disabled under the ADA because ASC unlawfully regarded him as disabled. An individual is regarded as disabled if: (1) an employer mistakenly believes that the individual has a physical impairment that substantially limits one or more major life activities, or (2) the employer mistakenly believes that the individual's actual, nonlimiting impairment substantially limits one or more major life activities. *See Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 119 S.Ct. 2139, 2149–50, 144 L.Ed.2d 450 (1999).

■ In a "regarded as" case, plaintiff cannot merely show that the employer perceives him as precluded from one type of job, a specialized job, or a particular job of choice. Rather, the pertinent question is whether the employer believes the individ-

ual is significantly restricted in his ability to perform a "class of jobs or a broad range of jobs in various classes, as compared to the average person having comparable training, skills and abilities." *See id.* at 2151 (upholding dismissal of the case where petitioners were precluded only from the job of global airline pilot but not that of flight instructor or regional pilot); *Murphy v. United Parcel Serv.,* 527 U.S. 516, 119 S.Ct. 2133, 2138–39, 144 L.Ed.2d 484 (1999) (affirming summary judgment for employer where applicant was not precluded from a broad class of jobs, i.e., mechanics, but only from a particular job, i.e., mechanics required to drive commercial vehicles); *see also Shipley v. City of University City,* 195 F.3d 1020, 1023 (8th Cir.2000) (affirming summary judgment where evidence indicated that employer terminated plaintiff only because of concerns about his capacity to perform as a firefighter).

■ In the instant case, the EEOC contends that ASC erroneously believed that Nordman's heart condition precluded him from working in a supervisory class of jobs. The EEOC relies on the testimony of Gary Kraus and Greg Kraus to support this contention. For example, in materials submitted to the State of Iowa regarding Nordman's claim for unemployment compensation, Gary Kraus noted that Nordman was offered a job in a "lesser capacity" without "managerial responsibilities." [Eng Aff., Nordman dep., Ex. 10 at 100040]. At his deposition, Kraus testified that he was concerned about Nordman's health and decided to relieve Nordman of his supervisory responsibilities in order to reduce the stress of deadlines, work volume and lack of manpower. [Burnside

Aff., Gary Kraus dep., pp. 58–60]. Similarly, Greg Kraus testified that it was apparent that the stress of deadlines and a heavy workload was "getting to" Nordman, causing Kraus to be concerned for Nordman "because of the two times [Nordman] was out for his heart problem." [Burnside Aff., Greg Kraus dep. pp. 23–25].

Based on this record, a reasonable jury could conclude that ASC believed Nordman's heart condition rendered him unable to work in any job with supervisory or managerial duties. *See Cline v. Wal–Mart Stores, Inc.,* 144 F.3d 294 (4th Cir.1998) (holding that employee was "regarded as" disabled when his employer demoted and eventually terminated him from his position as night maintenance supervisor because of belief that employee "could not hold the pressure he had as a supervisor" after having brain tumor removed); *Zakaras v. United Airlines, Inc.,* 121 F.Supp.2d 1196, 1216 (N.D.Ill.2000) (denying summary judgment for employer on "regarded as" claim where employer demoted plaintiff from supervisory position because of belief that plaintiff could not supervise other employees due to his alcoholism).[2] Accordingly, plaintiff has met its burden on the issue of whether Nordman is disabled under the ADA.

**E. Burden Shifting**

■ In documents prepared by ASC during administrative proceedings, Gary Kraus admitted that Nordman's heart condition played a role in ASC's decision to relieve Nordman of his supervisory responsibilities.

> Because of concerns about Mr. Nordman's health and to alleviate stress of being a supervisor that contributed to

**2.** The EEOC's interpretative guidelines to the ADA also note, for example, that if an employer reassigns an individual with controlled high blood pressure to less strenuous work because of unsubstantiated fears that the individual will suffer a heart attack if he or she continues to perform strenuous work, the employer would be regarding the individual as disabled. 29 C.F.R. pt. 1630, app. § 1630.2(1).

his condition, Automatic Systems decided to have Mr. John Server assume the supervisory duties that Mr. Nordman previously had performed...

[Burnside Aff., Gary Kraus dep., Exh. 9].

The court believes that this statement, together with the testimony of Gary Kraus and Greg Kraus cited above, constitutes " 'evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude ... sufficient to permit the factfinder to infer that that attitude was more likely than not a motivating factor in the employer's decision." ' *Radabaugh v. Zip Feed Mills, Inc.,* 997 F.2d 444, 449 (8th Cir. 1993) (quoting *Ostrowski v. Atlantic Mut. Ins. Cos.,* 968 F.2d 171, 182 (2d Cir.1992)). Accordingly, plaintiff is entitled to a direct evidence analysis under *Price Waterhouse,* shifting the burden to ASC to establish by a preponderance of the evidence that it would have relieved Nordman of his supervisory duties even if it had not taken his heart condition into account. *See id.*

ASC argues that it has sufficient evidence of workplace problems unrelated to Nordman's medical condition, such as Nordman's temper flare ups around co-workers and the impact of his decision to commute between Minnesota and Iowa to support its decision to replace Nordman as supervisor. However, viewing those facts in a light most reasonable to the EEOC, the court concludes that ASC has not made the requisite showing for purposes of summary judgment. Even under the *McDonnell Douglas* analysis, there is sufficient evidence for a factfinder to conclude that ASC's proffered legitimate reasons for the demotion are pretextual. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105 (2000) (holding that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employ-

er's asserted justification [for an adverse employment action] is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."). Therefore, summary judgment is denied as the plaintiff's ADA claim.

## II. Constructive Discharge Claim

Plaintiff also contends that ASC's decision to relieve Nordman of his supervisory responsibilities amounted to constructive discharge. Constructive discharge occurs when an employer " 'deliberately renders the employee's working conditions intolerable and thus forces the employee to quit his job.' " *Allen v. Bridgestone/Firestone, Inc.,* 81 F.3d 793, 796 (8th Cir.1996) (quoting *Johnson v. Bunny Bread Co.,* 646 F.2d 1250, 1256 (8th Cir.1981)). The employer's actions must have been intended to force the employee to quit. *Id.* The plaintiff can satisfy the intent requirement by showing that his resignation was a reasonably foreseeable consequence of his employer's discriminatory actions. *Id.* In addition, the plaintiff must show that a reasonable person in his situation would find the working conditions intolerable. *See id.* The intolerability of working conditions is judged by an objective standard, not the plaintiff's subjective feelings. *See West v. Marion Merrell Dow, Inc.,* 54 F.3d 493, 497 (8th Cir.1995).

As ASC correctly notes, constructive discharge cases are generally limited to those situations where an employee would feel compelled to resign to escape a hostile work environment, or where an employer imposes working conditions which are demeaning or inappropriate or which the employer knows will be unacceptable to the employee. In *Howard v. Burns Bros., Inc.,* 149 F.3d 835 (8th Cir.1998), the Eighth Circuit Court of Appeals reflected on what constitutes intolerable working conditions for purposes of constructive discharge:

Our recent cases have struggled with the question of what type of conditions are "intolerable" for constructive discharge purposes. "A plaintiff must show more than just a Title VII violation by her employer in order to prove that she has been constructively discharged." *Coffman,* 141 F.3d at 1247 (citing *Tidwell,* 93 F.3d at 495). In *Tidwell,* an employee who worked in an environment that was "tinged with discriminatory acts" was nevertheless not constructively discharged, because the acts were not so severe that a reasonable person would have found them intolerable. *Id.* at 497. Similarly, in *Hanenburg v. Principal Mutual Life Insurance Co.,* 118 F.3d 570 (8th Cir.1997), we affirmed summary judgment for the employer in a disparate treatment case, holding that the employee did not make a prima facie case of constructive discharge, though she produced evidence that "her supervisors scrutinized her behavior in the workplace more closely than it [sic] did other employees." *Id.* at 575. We stated that this discriminatory conduct could not, as a matter of law, suffice to establish constructive discharge: "While all this no doubt made work less enjoyable for Hanenburg and might have induced stress for her, there is simply not enough evidence to support a finding that her supervisors' conduct created the compulsion to quit that is necessary for a constructive discharge." *Id.* at 575.

*Howard,* 149 F.3d at 841–42.

▇▇▇ In this case, plaintiff does not allege that ASC harassed Nordman or created a hostile work environment. No new duties, demeaning or otherwise, were imposed on Nordman and no new schedule was proposed. *Cf. Parrish v. Immanuel*

*Med. Ctr.,* 92 F.3d 727 (8th Cir.1996) (affirming denial of employer's motion for judgment as a matter of law where employer assigned plaintiff new duties which were demeaning and offered plaintiff a new schedule which the employer knew she would refuse to accept.) To the contrary, the record indicates that both Greg and Gary Kraus believed Nordman was an excellent employee and their intent, however misplaced, was simply to relieve Nordman of the stress of his supervisory responsibilities and also to prevent disruption in the production schedule.[3] They did not believe they were demoting Nordman, a belief which they backed up by retaining Nordman at the same level of pay and benefits.

Even if the evidence in this case permits a jury determination that ASC's actions were unlawful under the ADA, the court does not believe that a jury would conclude that ASC intended to force Nordman to quit or that a reasonable person in Nordman's situation would decide that his working conditions had become so intolerable that he had no choice but to resign. Therefore, the court concludes that summary judgment as to plaintiff's constructive discharge claim is appropriate.

## CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that:

1. Defendant's motion for summary judgment is granted in part and denied in part.

2. Plaintiff's claim of constructive discharge is dismissed with prejudice.

3. Plaintiff's ADA claim remains viable.

---

**3.** Had ACS clearly relied on a lawful reason for its actions, such as this latter business-motivated rationale, the outcome of the ADA claim might well be different.