Mac Arthur **KAMMUELLER**

v.

**LOOMIS, FARGO & CO.**

**No. 02–CV–615 (JMR/FLN).**

United States District Court,
D. Minnesota.

Sept. 15, 2003.

Stephan Andrew Smith, Nichols Kaster & Anderson, Minneapolis, MN, for Plaintiff.

Kathryn A. Mrkonich, Littler Mendelson, Jeremy D. Sosna, Strathman & Sosna, Minneapolis, MN, for Defendant.

## ORDER

ROSENBAUM, Chief Judge.

Defendant, Loomis, Fargo & Co. ("Loomis"), is an armored car company. Among its other services, Loomis transports United States currency. Plaintiff, Mac Kammueller, worked for Loomis[1] in

---

1. Sweeney Loomis has undergone multiple name changes. For purposes of this motion, and by agreement of the parties, the defendant, regardless of its corporate name on any

various capacities for approximately 30 years. After Loomis terminated his employment, plaintiff brought this suit alleging violations of the Minnesota Human Rights Act ("MHRA"). *See* Minn.Stat. 363.03, subds. 1(2)(b)-(c), 1(6) (2002). Specifically, plaintiff charges defendant with disability discrimination and failure to accommodate his disability. This case is before the Court on defendant's motion for summary judgment.

## I. *Background*

### A. *Plaintiff's Medical Condition*

Mr. Kammueller was born with a permanent condition known as polycystic kidney disease. While a person so affected can live with normal health for many years, at some point cysts develop within the kidneys, reducing their function. The disease ultimately results in kidney failure requiring either dialysis or transplant. Plaintiff lived and worked for many years with this disease, but in 1995, the disease progressed, causing end-stage renal failure. As a result, he required immediate and regular kidney dialysis.

Plaintiff receives dialysis three times a week. Each appointment, which starts at 1:00 p.m., takes 4 to 5 hours. For purposes of this motion, the parties agree the time for this treatment is inflexible. Immediately following dialysis, Mr. Kammueller is physically exhausted and cannot work. Beyond dialysis, plaintiff's kidney disease limits the types of food and amount of fluid he can consume each day. The disease also limits his ability to lift,

resulting in a permanent 40 pound restriction. Plaintiff's medical records do not show that he discussed workplace accommodation measures with his doctors.

Periodically, plaintiff was required by Loomis to submit certified medical evaluation forms stating his physical qualifications for various job positions. Mr. Kammueller disclosed his kidney disease and dialysis treatment on these forms.

### B. *Employment History*

In 1968, plaintiff began working in Loomis's St. Paul branch office driving armored trucks. For the first 18 years, he drove armored trucks and acted as guard, protecting the custodian who rode in the rear. He would stand outside of the truck and survey the area for suspicious activity while the custodian picked up and delivered currency. In 1986, plaintiff voluntarily left Loomis, seeking higher pay as an over-the-road truck driver. Two years later, he returned to the Loomis driver/guard job, but lost all seniority from his original term of employment.

Mr. Kammueller worked as a driver/guard until 1995,[2] when his kidney failure and required dialysis resulted in his inability to perform the requirements of that position. In order to accommodate Mr. Kammueller's changed abilities and his dialysis schedule, Loomis assigned him as a "permanent driver" on Route 11, which began at approximately 3:00 a.m. According to Timothy Maurer, Loomis's general manager,[3] this accommodation was

---

given day, will be referred to herein as "Loomis."

**2.** In 2000, the driver/guard position was renamed Armored Service Technician ("AST"), which included the added responsibilities previously assigned to the custodian. But because of his disability, Mr. Kammueller continued to perform only the driving and guarding duties.

**3.** As general manager, Tim Maurer was the most senior employee in the St. Paul office. Chuck Hedlund, human resources manager, assumed the most responsibility for employment decisions. Operations manager Curt Deaver handled the day-to-day business of the armored trucks, including routing and scheduling.

not burdensome, because Route 11's early start made it an unpopular assignment. In 2001, Route 11 was shortened to require only four hours of driving. After completing his route, Mr. Kammueller worked in Loomis's vault, helped other drivers, and used a cart to load money into each armored car.

In September, 2001, Loomis lost long-time client Wells Fargo. This significant loss of business, coupled with a general decline in the economy, forced Loomis to lay off about half its 100 employees. Loomis's corporate headquarters informed the St. Paul office that layoffs "needed to be in reverse seniority order and that the people who were retained needed to be able to do the complete job."[4] Hedlund Dep. at 19:8–11.

When Loomis managers first met to discuss the impending layoffs, Deaver recommended retaining plaintiff on the night shift. Initially, Maurer also preferred this arrangement. This solution was rejected, however, because Loomis's business no longer required a full eight hour shift at night.

On September 24, 2001, Mr. Kammueller met with Hedlund and Deaver to discuss the reduction in force and concomitant changes in workforce policy. At this meeting, plaintiff told Hedlund his dialysis schedule and lifting requirements limited his ability to work as anything but the Route 11 driver. Mr. Kammueller reported he was unable to lift the 50 pound bags of coin as required. Loomis asked him to obtain a doctor's physical and written medical certification documenting his restrictions. When Loomis told Mr. Kammueller it could not waive the lifting requirements, plaintiff said "he knew his legal rights" and would contact a lawyer if necessary. Hedlund replied that he could not alter his

position unless told by management to do so, and that plaintiff would need to make a decision about a lawyer.

In December, Mr. Kammueller met with Maurer to express his concerns over job security and the new work requirements. He wanted to continue his employment with Loomis driving the night shift and working in the vault. On January 8, 2002, however, Loomis ended plaintiff's employment, citing Kammueller's inability to perform all of the duties of the AST position and to meet the company's scheduling needs.

### C. Workplace Comments

Plaintiff offers a series of comments in support of his discrimination claim, and asserts that various coworkers and managers commented on his health and dialysis.

The Loomis dispatcher, Dianne Gerlach, reports that in June, 2000, she overheard a discussion about trying to "get rid of" some employees, including plaintiff. Gerlach Dep. at 14:3–16:7. During this conversation, an unidentified member of management said Mr. Kammueller "was a thorn in the side of Loomis Fargo." Id. at 25:7–26:19. Lyle Zerwas, a Loomis mechanic, similarly told Mr. Kammueller that he thought Loomis intended to "get rid of him." George Hoffman, a route supervisor from 1995–2001, testified that Deaver said he "wanted to get rid of Mac." Hoffman Dep. at 20:20–22. Hoffman said Hedlund also wanted "to see Mac gone." *IdFederation Internationale De Football Ass'n v. Nike, Inc.* at 20:23–24

Gerlach and Kammueller testified about difficulty finding workers to relieve plaintiff at the end of his shift, making it difficult for him to leave for dialysis. Gerlach

---

4. The parties agree that Mr. Kammueller had enough seniority to survive the layoffs if able to perform the required job duties.

reported feeling the company purposefully sent plaintiff's replacements out on other routes, leaving no one at headquarters to take his place. Gerlach Dep. at 19:18–25. According to Gerlach, Curt Deaver told her "it was getting old and difficult to find someone to replace him." *Id.* at 20:1–11.

George Hoffman, plaintiff's route supervisor from 1995–2001, testified about a meeting with Deaver, Maurer, and Hedlund in the spring of 2001 during which complaints were made about difficulty accommodating plaintiff's dialysis schedule. Hoffman Dep. at 13:4–16; Deaver Dep. at 14:19–15:9.

## II. *Standard of Review*

Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Federal Rule of Civil Procedure 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 246, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party opposing summary judgment may not rest upon the allegations set forth in its pleadings, but must produce significant probative evidence demonstrating a genuine issue for trial. *See Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505; *see also Hartnagel v. Norman,* 953 F.2d 394, 395–96 (8th Cir. 1992). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505. If the opposing party fails to carry that burden, or fails to establish the existence of an essential element of its case on which that party will bear the burden of proof at trial, summary judgment should be granted.

*See Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

## III. *Discrimination Claims*

■ Plaintiff claims wrongful discharge based on his disability and failure to accommodate his disability, in violation of the MHRA. The MHRA provides:

> Except when based on a bona fide occupational qualification, it is an unfair employment practice ... [f]or an employer, because of race, color, creed, religion, national origin, sex, marital status, status with regard to public assistance, membership or activity in a local commission, disability, sexual orientation, or age ... to discharge an employee.

Minn.Stat. § 363.03, subd. 1(2)(b). A discrimination plaintiff may prove discriminatory intent with direct or circumstantial evidence. *See Hoover v. Norwest Private Mortgage Banking,* 632 N.W.2d 534, 542 (Minn.2001).

### A. *Direct Evidence*

■ Plaintiff claims workplace comments provide direct evidence of discrimination. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 251, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) superseded in part by the 1991 Civil Rights Act, 42 U.S.C. § 2000e–2(m). In considering such comments, the Eighth Circuit Court of Appeals carefully distinguishes "comments which demonstrate a discriminatory animus in the decisional process ... from stray remarks in the workplace, statements by non-decisionmakers, or statements by decisionmakers unrelated to the decisional process." *Mohr v. Dustrol, Inc.,* 306 F.3d 636, 640–41 (8th Cir.2002), overruled on other grounds in *Desert Palace, Inc. v. Costa,* — U.S. —, 123 S.Ct. 2148, 2155, 156 L.Ed.2d 84 (2003) (internal quotations omitted); *see also Price Waterhouse,* 490 U.S. at 277, 109 S.Ct. 1775

(O'Connor concurring). In a discrimination suit, direct evidence is that which is sufficient to establish a causal link between the alleged discriminatory animus and the challenged employment decision. *Thomas v. First Nat'l Bank of Wynne,* 111 F.3d 64, 66 (8th Cir.1997); *Goins v. West Group,* 635 N.W.2d 717, 722 (Minn.2001) (considering direct evidence as proof of discriminatory motive or intent under MHRA). Applying these principles, plaintiff's proffered statements do not qualify as direct evidence.

■ First, the Court notes that none of the statements introduced by plaintiff express any discriminatory animus. *See Beshears v. Asbill,* 930 F.2d 1348, 1354 (8th Cir.1991) (stating that comments showing discriminatory animus in hiring process constitute direct evidence). The only management discussion of plaintiff's dialysis occurred in the meeting between Hoffman, Deaver, Maurer and Hedlund, when the managers described difficulty because the dialysis schedule "didn't fit the schedule that we needed him to fit at that particular time." Pl. Memo. at 5. At best, this statement demonstrates that plaintiff's current schedule no longer suited the needs of Loomis's clients. The statement is consistent with Mr. Kammueller's shortened driving schedule and move to the Loomis vault. On its face, this statement, which makes no reference to Mr. Kammueller's medical needs or condition, cannot be considered direct evidence of discrimination. *See Mayer v. Nextel W. Corp.,* 318 F.3d 803, 810 (8th Cir.2003).

Focusing particularly on the statements by Deaver and Hoffman regarding a desire to end plaintiff's employment, these similarly do not demonstrate discriminatory intent. Even if these statements were made, they occurred in the spring of 2001—months before the loss of the Wells Fargo business. Loomis retained Mr. Kammueller in his Route 11 job from the date of the alleged conversation until the business-necessitated reduction in force. The Eighth Circuit has recognized there must be a temporal nexus between workplace statements and claimed-discriminatory acts in order for the statements to be considered probative of discrimination. *See Kipp v. Missouri Highway & Transp. Comm'n,* 280 F.3d 893, 897 (8th Cir.2002) (holding in retaliation case that "the interval of two months ... so dilutes any inference of causation that we are constrained to hold as a matter of law that the temporal connection could not justify a finding ... on the matter of causal link."); *Feltmann v. Sieben,* 108 F.3d 970, 977 (8th Cir.1997) (finding six months between incident and termination insufficient to support a causal connection); *Cram v. Lamson & Sessions Co.,* 49 F.3d 466, 474 (8th Cir.1995) (finding less than three month passage of time insufficient to prove link between events); *see also Sprenger v. Fed. Home Loan Bank of Des Moines,* 253 F.3d 1106, 1113–14 (8th Cir.2001) (applying temporal proximity standard in ADA case).

Given these circumstances, this conversation lacks the immediacy which can support a discrimination claim, particularly in light of the major changes which befell Loomis's business. The statements do not present a triable issue on the question of whether Loomis intended to terminate Mr. Kammueller's employment because he fell within a protected class. *See Erickson v. Farmland Indus., Inc.,* 271 F.3d 718, 724 (8th Cir.2001) ("[T]he direct evidence required to shift the burden of proof is evidence of conduct or statements by persons involved in making the employment decision directly manifesting a discriminatory attitude, of a sufficient quantum and gravity that would allow the factfinder to conclude that attitude more likely than not was a motivating factor in the employment decision.").

None of plaintiff's other proffered statements are attributable to a Loomis decisionmaker or connected to the decision to end his employment. For example, neither Ms. Gerlach nor Mr. Zerwas identified the speaker of the "get rid of" or "thorn in the side of the company" remarks. These statements, overheard almost 18 months before plaintiff lost his job, do not constitute direct evidence.

Similarly, any connection between workers available to work in the vault at the end of plaintiff's shift and illegal discrimination is conjecture. Indeed, they do not show that it was difficult on a regular basis. While coworkers may speculate about bias motivating the difficulty, the testimony lacks the foundation necessary to fulfill Rule 56(e)'s requirement that statements in reply to a motion for summary judgment "set forth such facts as would be admissible into evidence." *See* Fed.R.Civ.P. 56(e). There is no evidence other than mere speculation to prove this connection. As a result, Mr. Kammueller has failed to introduce any direct evidence of discrimination.

### B. *Circumstantial Evidence*

■ Alternatively, plaintiff may prove discriminatory intent though circumstantial evidence. *See Hubbard v. United Press Int'l, Inc.,* 330 N.W.2d 428, 445 (Minn.1983). First, plaintiff must prove a prima facie case of discrimination. In order to do so, he must show he is a member of a protected class, qualified to perform the functions of the job with or without a reasonable accommodation, and he suffered an adverse employment action based on his membership in the protected class. *Dietrich v. Canadian Pac. Ltd.,* 536 N.W.2d 319, 324–25 (Minn.1995) (requiring proof of discriminatory intent in cases of employee layoffs); *Snow v. Ridgeview Med. Ctr.,* 128 F.3d 1201, 1206 (8th Cir. 1997); Minn.Stat. § 363.01, subd. (35). Plaintiff must show his disability was a determining factor in his termination. *See Aucutt v. Six Flags Over Mid–Am., Inc.,* 85 F.3d 1311, 1318 (8th Cir.1996).

### 1. *Is Plaintiff Disabled?*

Loomis argues plaintiff is not disabled, and therefore, not a member of a protected class. "A disabled person is one who (1) has a physical, sensory, or mental impairment which materially limits one or more major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment." Minn. Stat. § 363.01.[5] A court evaluates claimed disability on an individualized basis. *See Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 483, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). Here, plaintiff argues he has a materially limiting physical impairment and a record of disability.[6]

#### a. *Does Plaintiff Suffer From a Material Limitation?*

■ The parties agree that renal failure and dialysis constitute a physical impairment. *See Sigurdson v. Bolander & Sons. Co.,* 532 N.W.2d 225, 228 (Minn.1995). The Court must consider, however, whether this impairment materially limits one of plaintiff's major life activities. In the context of the ADA, the Supreme Court has

---

**5.** The Minnesota Supreme Court distinguishes between the Americans with Disabilities Act ("ADA") definition of disability as a "substantial limitation," and Minnesota's less stringent "material limitation" standard. *See Hoover,* 632 N.W.2d at 543 n. 5 (citing 42 U.S.C. § 12102(2)). The Supreme Court rejected federal case analysis using the substantial limitation as inconsistent with its law. *Id.* All other issues arising under the MHRA, however, can be analyzed using federal law and standards. *See Sigurdson,* 532 N.W.2d at 228.

**6.** Plaintiff has not argued he was regarded as disabled while employed by Loomis.

recently defined "major life activities" as those "of central importance" in daily life. *Toyota Motor Mfg., Ky. Inc. v. Williams*, 534 U.S. 184, 197, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002); *see also Fenney v. Dakota, Minn. & Eastern R.R. Co.*, 327 F.3d 707, 714–15 (8th Cir.2003) (applying *Toyota* to MHRA disability analysis). Plaintiff claims a material limitation in the major life activities of working, lifting, eating, and drinking.[7]

■ To determine if a person suffers from a material limitation in the activity of working, the Court considers "the number and type of jobs from which the impaired individual is disqualified, the geographic area to which the applicant has reasonable access, the applicant's own job expectations and training, the criteria or qualifications in use generally, and the types of jobs to which the restriction would apply." *Hoover*, 632 N.W.2d at 543. Citing *Hoover*, plaintiff suggests that after 32 years of work, he can work only as an armored car driver. *See* 632 N.W.2d at 544.

■ Mr. Kammueller's situation, however, is distinguishable from that in *Hoover*, where an employee was fired after a career working in loan organization and banking. Such a position requires specialized training and professional expertise. *See id.* This contrasts with Mr. Kammueller's work; while the position of ATS requires training, it remains—among other things—a "driving" job. Plaintiff has spent much of his work life in a "driving" job in the armored car industry and as a long-haul trucker.

In addition to driving, both jobs impose additional duties on the driver. Plaintiff does not suggest he is unable to drive. Even viewing the facts in the light most favorable to plaintiff, he is qualified for other jobs involving driving and guarding. His lifting limitation similarly does not render him ineligible to work. He is able to lift less than 40 pounds, and is able to perform jobs with such a requirement.

While plaintiff claims his dialysis appointments preclude him from working, his employment at Loomis indicates he is able to work early morning or late evening shifts. *See Amos v. Wheelabrator Coal Serv., Inc.*, 47 F.Supp.2d 798, 803 (N.D.Tex.1998) (finding limited work availability caused by dialysis schedule not a qualifying disability because plaintiff was eligible for some schedules). The Court cannot find plaintiff eligible only for the job from which he was fired, and therefore materially impeded from obtaining and retaining employment.

■ Second, plaintiff argues he is disabled from the major life activity of lifting. *See Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 948 (8th Cir.1999) (finding lifting is a major life activity). The Court considers the materiality of this restriction by considering its nature, severity, duration, and long-term impact. *See Maziarka v. Mills Fleet Farm, Inc.*, 245 F.3d 675, 679 (8th Cir.2001) (applying this standard in MHRA case). While the Minnesota courts have not considered when a lifting restriction is materially limiting, the Eighth Circuit has done so, finding a 25 pound restriction is neither materially or substantially limiting. *See Aucutt*, 85 F.3d at 1319; *see also Gutridge v. Clure*, 153 F.3d 898, 901 (8th Cir.1998) (finding a 45 pound lifting restriction is not "substantially limiting"); *Snow*, 128 F.3d at 1207.

■ Here, plaintiff cannot lift more than 40 pounds without physical danger to

---

7. The Court need not find, as defendant suggests, that plaintiff is impaired from performing major life activities generally. Def. Memo at 11; Def. Reply at 9 (citing defendant's ability to care for himself, walk, see, hear, speak and breathe as evidence he is not disabled.)

himself. While this risk is great, plaintiff's situation is readily distinguishable from situations where individuals are unable to lift at all, which limits their ability to perform the ordinary tasks of everyday life. Plaintiff is the primary caretaker of his disabled wife and their home, able to grocery shop, help her up and down stairs, do the laundry and the cleaning. Given the standard established by *Toyota, see* 534 U.S. at 197, 122 S.Ct. 681, there is little evidence he is unable to perform the lifting function in daily life. Instead, his lifting restriction is limited to performing his job duties at Loomis. The Court cannot find his 40 pound lifting restriction materially limits the life activity of lifting.

 Third, plaintiff argues he is disabled from the major life activities of eating and drinking. *See Amir v. St. Louis Univ.,* 184 F.3d 1017, 1027 (8th Cir.1999) (eating and drinking are major life activities); *Land v. Baptist Med. Ctr.,* 164 F.3d 423, 424 (8th Cir.1999) (eating is a major life activity). Eating and drinking are undeniably central to daily life. The question is whether plaintiff's end stage renal failure materially limits his ability to eat and drink. It does not. Here, the record shows plaintiff must limit the types of foods he eats, as well as the quantity of fluids he drinks, in order to avoid discomfort, edema, and some potentially serious but temporary side effects. His physical ability to eat and drink, however, is not restricted. *See Land,* 164 F.3d at 425; *see also Waldrip v. Gen. Elec. Co.,* 325 F.3d 652, 655 (5th Cir.2003). As a result, limitations on plaintiff's ability to eat and drink cannot support a claim of discrimination.

Finally, Mr. Kammueller cites cases in which individuals receiving dialysis or suffering from end stage renal failure were categorized as disabled. One case held, without further explanation, that end-stage renal failure and dialysis three times per week "clearly qualify as disabilities" under the ADA. *See McDonald v. Menino,* 1997 WL 106955, *2 (D.Mass., Jan. 3, 1997); *see also Lewis v. Bd. of Trustees,* 874 F.Supp. 1299, 1305 (M.D.Ala.1995).[8] In another case under the Rehabilitation Act, the Second Circuit Court of Appeals stated:

We are inclined to view persons whose kidneys would cease to function without mechanical assistance, or whose kidneys do not function sufficiently to rid their bodies of waste matter without regular dialysis, as being substantially limited in their ability to care for themselves.

*Gilbert v. Frank,* 949 F.2d 637, 641 (2d Cir.1991).

These findings, however, do not control here. Clearly, one who requires dialysis several times a week is impaired, but this finding does not mean such a person automatically prevails in an employment discrimination case. Minnesota courts require a more nuanced review. In light of *Toyota,* the Court believes the cited cases' failure to discuss with any particularity how dialysis materially and meaningfully affects major life activities renders their conclusions unpersuasive.

Here, plaintiff has never claimed he is unable to care for himself; instead, the evidence shows he not only cares for himself, he is also the caretaker for his disabled spouse. Given a specific factual rec-

---

**8.** Plaintiff also cites *Saks v. Franklin Covey Co.,* 117 F.Supp.2d 318, 326 (S.D.N.Y.2000), which states that people who suffer from chronic organ failure—namely diabetes or kidney failure—should be considered disabled regardless of any ability to treat those conditions with dialysis. In *Sutton,* the United States Supreme Court specifically found corrective measures must be taken into account when considering whether a person is disabled. *See* 527 U.S. at 488–89, 119 S.Ct. 2139. As a result, *Saks* is no longer precedential.

ord contradicting the conclusions reached in *Gilbert,* the Court cannot find plaintiff disabled as a matter of law. *See Jones v. Roadway Express, Inc.,* 2003 WL 76868, *4–6 (N.D.Ill. Jan. 8, 2003).

### b. *Does Plaintiff Have a Record of Disability?*

Having decided plaintiff is not per se disabled, the Court must consider whether he has a record of disability. *See* Minn. Stat. § 363.01, subd. 13; *see also Wheaton v. Ogden Newspapers, Inc.,* 66 F.Supp.2d 1053, 1064 (N.D.Iowa 1999). Plaintiff cites the certified medical evaluation forms, which indicate he suffers from kidney disease and is on dialysis, as a record of disability.

■ But, as explained above, the fact that plaintiff receives dialysis alone does not make him disabled, and absent a per se rule, a record of dialysis does not prove disability. *See Land,* 164 F.3d at 425; *EEOC v. Automatic Sys. Co.,* 169 F.Supp.2d 1001, 1006 (D.Minn.2001) (record of hospitalization does not establish record of disability). Absent some additional showing of a history of material limitations, plaintiff has not met his burden.

### 2. *Is Plaintiff A Qualified Person?*

Even had the Court found plaintiff disabled, he is unable to satisfy the sine qua non: he has not presented a triable case on his qualification to perform the essential functions of his position, with or without accommodation. The burden is not especially onerous—plaintiff need only establish that he "met the minimum objective qualifications for the job." *Hoover,* 632 N.W.2d at 544.

For the AST position, the first question is whether lifting more than 40 pounds was an essential job function. *See Alexander v. Northland Inn,* 321 F.3d 723, 727 (8th Cir.2003). Essential functions include the fundamental job duties of the position the employee holds. *Id.* (citations omitted). "The employer's judgment on this question is highly probative." *Id.* Still, the employer must introduce evidence demonstrating those essential functions. *See Fenney,* 327 F.3d at 712.

■ Here, defendant claims plaintiff is unable to fulfill the AST job duties, in that an AST must:

> pick-up/deliver customer change orders/deposits carrying a minimum of 50 pounds by hand or to several hundred pounds by cart .... Load/unload vehicle cargo consisting of several bags and boxes of coin, weighing as much as 60 lbs per item ....

*See* Def. Exh. 1B. The record evidence demonstrates this limitation was necessary because an AST was regularly called upon to move large quantities of cash—specifically 50 pound bags of coin. The reduction-in-force—which unquestionably occurred at Loomis—necessitated enforcement of all minimum objective qualifications for the AST position. There is no dispute that plaintiff's restrictions rendered him incapable of lifting 50 pounds, and he was, perforce, unable to fulfill the basic job requirements.

Plaintiff argues, however, that he could perform the task with an accommodation. Under Minnesota Statutes Section 363.03, subdivision 1(6), employers are required to "make reasonable accommodation to the known disability of a qualified disabled person." Plaintiff contends he could perform the AST position if he was not required to lift, and was given Route 11. He argues his requested accommodation was reasonable as a matter of law. His argument fails.

An employer is not required to accommodate a disabled employee when doing so results in an undue hardship on the operation of business. Minn.Stat. § 363.03,

subd. 1(6). Nor must an employer abandon an essential function of a position to accommodate an employee. *See Northland*, 321 F.3d at 728. "It is well settled that an employer is under no obligation to reallocate the essential functions of a position that a qualified individual must perform." *Moritz v. Frontier Airlines, Inc.*, 147 F.3d 784, 788 (8th Cir.1998); *see also Gilbert*, 949 F.2d at 644 (finding, in case involving individual on dialysis, that employer is not required to accommodate by waiving lifting requirement if it is an essential job function). Loomis was simply not required to abandon the lifting requirement to accommodate plaintiff's medical needs.

Similarly, the law does not compel an employer to create a special work schedule for a disabled employee. *Helgerson v. Bridon Cordage, Inc.*, 518 N.W.2d 869, 872–73 (Minn.Ct.App.1994) (finding employer was not required to create job exempt from uniform requirements and schedule to accommodate a disability); *see also Amos*, 47 F.Supp.2d at 803. Here, after September, 2001, Loomis added a flexible scheduling requirement for all ASTs.

The record evidence indicates that Loomis required all ASTs who survived the reduction in force to perform all the functions of the position. The economic reality is not disputed: after Loomis lost the Wells Fargo account, there were no limited service positions left at the company. These facts stand undisputed, and plaintiff has produced no evidence suggesting the change in policy was not necessitated by the loss of Wells Fargo's business and other business during the recent recession. There is simply no evidence showing Loomis would have continued to maintain the former Route 11 once driven by Mr. Kammueller. The evidence is directly to the contrary. Route 11 no longer exists; it has been altered to conform to current customer needs.

Finally, plaintiff erroneously argues Loomis had formerly accommodated Mr. Kammueller and has somehow reneged on an arrangement to do so after losing the Wells Fargo business. This argument misconstrues both the law and facts. While an employer may allow plaintiff to work a reduced position, the law does not require an employer to do so where it is an undue burden. When an employer engages in a reduction-in-force resulting in the unquestioned loss of almost one-half of its employees, the adjustments which may have been available in the past may be unavailable in the changed business environment. The law does not compel a business facing such a real-world exigency to continue a practice—however commendable—which no longer serves its business needs.

Similarly, plaintiff's case cannot hang on the testimony of Mr. Deaver expressing his personal desire to allow plaintiff to drive Route 11 and work in the vault. On review, the evidence merely shows that various managers discussed a number of ways plaintiff might remain at Loomis, only to ultimately decide—under the direction of company headquarters—that business necessity required employees to perform all tasks inherent in their position. Beyond this, while Mr. Deaver's knowledge of AST routes as operations manager was useful, he was not ultimately a human resources supervisor, or one with the capacity to make hiring decisions. There is simply no evidence that Loomis offered an accommodation to plaintiff only to later rescind it. The Court cannot require an employer's accommodation of an employee's condition to forever bind the company and estop it from conforming to changed business needs. Plaintiff's failure to accommodate claim fails.

### 3. *Evidence of Disability Animus*

█ The "direct evidence" introduced in this case does not establish any disability animus. Loomis continued to employ Mr. Kammueller for six years after his dialysis began, facilitating his dialysis schedule by placing him on a night shift and limiting his tasks to driving. Absent any evidence, direct or otherwise, which links his termination to discriminatory intent, the Court cannot find plaintiff has met his prima facie case.

### IV. *Conclusion*

In order to maintain a claim of disability discrimination or failure to accommodate, in the face of a well pleaded motion for summary judgment, a plaintiff must produce evidence demonstrating that he is disabled within the meaning of the MHRA. Plaintiff has not been able to do so, nor has he introduced evidence showing he was qualified to perform the AST duties. Finally, he has introduced no credible evidence connecting his layoff to his physical condition. On none of these essential elements has plaintiff shown a need for a trial on the merits. Accordingly,

Defendant's motion for summary judgment [Docket No. 8] is granted.

IT IS SO ORDERED.